# In re IZUMMI, Petitioner

*In Visa Petition Proceedings*

A76 426 873

Decided by the Associate Commissioner, Examinations, July 13, 1998.

(1) Regardless of its location, a new commercial enterprise that is engaged directly or indirectly in lending money to job-creating businesses may only lend money to businesses located within targeted areas in order for a petitioner to be eligible for the reduced minimum capital requirement.

(2) Under the Immigrant Investor Pilot Program, if a new commercial enterprise is engaged directly or indirectly in lending money to job-creating businesses, such job-creating businesses must all be located within the geographic limits of the regional center. The location of the new commercial enterprise is not controlling.

(3) A petitioner may not make material changes to his petition in aneffort to make a deficient petition conform to Service requirements.

(4) If the new commercial enterprise is a holding company, the full requisite amount of capital must be made available to the business(es) most closely responsible for creating the employment on which the petition is based.

(5) An alien may not receive guaranteed payments from a new commercial enterprise while he owes money to the new commercial enterprise.

(6) An alien may not enter into a redemption agreement with the new commercial enterprise at any time prior to completing all of his cash payments under a promissory note. In no event may the alien enter into a redemption agreement prior to the end of the two-year period of conditional residence.

(7) A redemption agreement between an alien investor and the new commercial enterprise constitutes a debt arrangement and is prohibited under 8 C.F.R. § 204.6(e).

(8) Reserve funds that are not made available for purposes of job creation cannot be considered capital placed at risk for the purpose of generating a return on the capital being placed at risk.

(9) The Service does not pre-adjudicate immigrant-investor petitions; each petition must be adjudicated on its own merits.

(10) Under 8 C.F.R. § 204.6(e), all capital must be valued at fair market value in United States dollars, including promissory notes used as capital. In determining the fair market value of a

169

promissory note, it is necessary to consider, among other things, present value.

(11) Under certain circumstances, a promissory note that does not itself constitute capital may constitute evidence that the alien is "in the process of investing" other capital, such as cash. In    such a case, the petitioner must substantially complete payments on the promissory note prior to the end of the two-year conditional period.

(12) Whether the promissory note constitutes capital or is simply evidence that the alien is in the process of investing other capital, nearly all of the money due under the promissory note must be payable within two years, without provisions for extensions.

(13) In order for a petitioner to be considered to have established an original business, he must have had a hand in its actual creation.

ON BEHALF OF PETITIONER:   MAURICE INMAN/FREDRICK W. VOIGTMANN
                            1925 CENTURY PARK EAST, 16TH FLOOR
                            LOS ANGELES, CA  90067


## DISCUSSION

The preference visa petition was denied by the Director, Texas Service Center, who certified the decision to the Associate Commissioner for Examinations for review. The decision of the director will be affirmed.

The petitioner seeks classification as an alien entrepreneur pursuant to section 203(b)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5), and section 610 of the Appropriations Act of 1993. The director determined that the petitioner had failed to establish that he had placed the requisite capital at risk. The director made the following findings: $30,000 of the claimed contribution would be used for the expenses of the Partnership rather than being infused into the subsidiary commercial enterprise for the purpose of employment creation; the majority of the remaining capital would not be available for job creation because the Partnership was required to maintain it in reserves; part of the petitioner's capital contribution was not an investment because it was made in exchange for a debt arrangement; and another part of the petitioner's contribution would derive from guaranteed annual interest payments received from the Partnership.

In response, the petitioner submits two separate briefs, two supplemental briefs, and numerous exhibits. He contends that the director's decision misstates existing facts and mischaracterizes the provisions of the American Export Limited Partnership ("AELP") investor program. The petitioner also complains that the director's decision fails to mention, distinguish, or "explain away" approvals of other AELP petitions by both the Texas Service Center and Vermont Service Center; furthermore, the director's decision fails to mention, distinguish, or "explain away" prior Service opin-

ions and communications that directly supported and authorized the use of various features of the AELP program. The petitioner states that, even if the director had been correct in denying the petition, certain new amendments to the partnership plan should cause the Administrative Appeals Unit (AAU) to approve his petition.

Oral argument was granted in this case, and during his presentation counsel reiterated the points made in the brief. Counsel emphasized that the petitioner had made an investment by executing and delivering the promissory note for $500,000; the schedule of future payments under the note was irrelevant.

Section 203(b)(5)(A) of the Act provides classification to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise:

> (i)  which the alien has established,
>
> (ii)  in which such alien has invested (after the date of the enactment of the Immigration Act of 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C), and
>
> (iii)  which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

The petitioner indicates that the petition is based on an investment in a new business in a targeted employment area for which the required amount of capital invested has been adjusted downward. In addition, the business is located in an area designated as a "regional center" authorized to participate in the Immigrant Investor Pilot Program.

## THE PETITIONER HAS NOT DEMONSTRATED THAT AELP IS ENGAGING IN APPROVED REGIONAL-CENTER ACTIVITIES IN TARGETED EMPLOYMENT AREAS

8 C.F.R. § 204.6(e) states, in pertinent part, that:

> *Targeted employment area* means an area which, at the time of investment, is a rural area or an area which has experienced unemployment of at least 150 percent of the national average rate.

8 C.F.R. § 204.6(j)(6) states that:

> If applicable, to show that the new commercial enterprise has created or will create employment in a targeted employment area, the petition must be accompanied by:

(i) In the case of a rural area, evidence that the new commercial enterprise is principally doing business within a civil jurisdiction not located within any standard metropolitan statistical area as designated by the Office of Management and Budget, or within any city or town having a population of 20,000 or more as based on the most recent decennial census of the United States; or

(ii) In the case of a high unemployment area:

(A) Evidence that the metropolitan statistical area, the specific county within a metropolitan statistical area, or the county in which a city or town with a population of 20,000 or more is located, in which the new commercial enterprise is principally doing business has experienced an average unemployment rate of 150 percent of the national average rate; or

(B) A letter from an authorized body of the government of the state in which the new commercial enterprise is located which certifies that the geographic or political subdivision of the metropolitan statistical area or of the city or town with a population of 20,000 or more in which the enterprise is principally doing business has been designated a high unemployment area. The letter must meet the requirements of 8 C.F.R. § 204.6(i).

On October 19, 1995, American Export Partners, LLC ("AEP") filed its articles of organization with the State of South Carolina. On March 25, 1996, AELP filed its certificate of limited partnership with the State of South Carolina, and AEP was designated as AELP's general partner. Both AEP and AELP are located in Charleston, South Carolina.

In a letter dated February 8, 1995, the Assistant Commissioner for Adjudications designated AEP a regional center and specified that individuals could file petitions with the Service "for new commercial enterprises located within the eight-county coastal areas, or Lowcountry, of South Carolina." On June 14, 1995, the Acting Assistant Commissioner for Adjudications expanded the geographical area covered by the AEP regional center to include 22 other counties in South Carolina.

The petitioner has presented evidence that many, but not all, of the counties within this regional center were considered rural in 1995 and qualified at that time as targeted employment areas.[1]

In his brief, the petitioner explains that AELP has established a commercial credit corporation subsidiary, American Commercial and Export Credit Company, Inc., with its co-venturer, Resurgens Capital & Investment. This credit company makes asset-based loans and engages in receivables financing for small export companies "located throughout South Carolina and the southeastern United States." The capital provided by the alien investors to AELP is used to purchase stock in the credit com-

---

[1]Of the 22 new counties added to the regional-center area, Aiken, Edgefield, Lexington, Richland, and Sumter counties were not targeted employment areas in 1995.

pany, and the credit company uses this money to secure loans from an institutional bank lender. This other lender will increase the capital by a factor of three or four. The petitioner claims that the credit company has succeeded in placing "several" loans already.

According to the materials submitted, the credit company has extended or purchased four loans to date. The credit company has purchased a $780,000 loan that had been extended to Pillow Perfect, Inc. by First Capital Bank; Pillow Perfect is located in Woodstock, Georgia. The credit company has purchased a $380,000 loan that had been extended to Pointe Services, Inc. by First Capital Bank; Pointe Services is located in Atlanta, Georgia. The credit company has extended a $200,000 loan to Advanced Technology Services, Inc. located in Atlanta, Georgia. Finally, the credit company has extended a $1,000 loan to Bitz America, Inc., in Martinez, Georgia.

It is not known how much the credit company paid to purchase the loans involving Pillow Perfect and Pointe Services. The above four loans evidence at most the use of only $1,361,000 of the funds obtained from the first 95 investors who were granted under this program.[2] The petitioner has provided loan-prospect reports from October 1997 and February 1998; these reports show that the credit company has proposed (but not succeeded in) lending money to various companies in Norcross, Oakwood, Atlanta, and Marietta, Georgia as well as Miami and Orlando, Florida.

Pillow Perfect is located in Cherokee County, Georgia; according to the employment information submitted by counsel, Cherokee County did not have any census tracts that qualified as areas of high unemployment in 1995. Pointe Services and Advanced Technology Services, Inc., are located in Fulton County. The petitioner has not demonstrated that these companies are located in the particular census tracts that qualified as areas of high unemployment in 1995 or in any other year. Nor has the petitioner shown that Bitz America is located in a targeted employment area.

The few transactions in which the credit company has engaged have not been shown to benefit companies located in targeted employment areas.[3] Even the businesses considered "loan prospects" are not located in targeted employment areas. Neither the credit company, headquartered in Atlanta, nor AELP, headquartered in Charleston, has been shown to be located in a targeted employment area. Therefore, the amount of capital necessary to make a qualifying investment in this matter is $1,000,000.

---

[2]This computes to approximately $14,327 per investor, far short of the requisite $500,000 per investor.

[3]It is noted that the employment information provided by counsel is out of date, in any event. A petitioner must establish that certain areas are targeted employment areas as of the date he files his petition; just because a particular area used to be rural many years ago, for example, does not mean that it still is.

Also, the regional-center designation in this case was granted for most of the counties in South Carolina. It did not extend to Georgia or Florida. While AELP is located in South Carolina, neither the credit company extending the actual loans nor the companies receiving the loans are located within the regional center. Therefore, the petitioner must establish direct employment creation.

The petitioner states in his brief that the Service had expressly permitted the use of the subsidiary credit corporation as a vehicle for making loans to export-related businesses not related to the regional center. He refers to a letter dated September 27, 1995, from the Chief of the Immigrant Branch, Adjudications, who was asked whether the customers of an export credit corporation needed to be located within the region covered by the regional-center designation. The Chief's response did not directly address this question; instead, he stated, "Although the regional center should focus on a geographical area, there is no requirement in either the statute or the regulations that the exports generated under the Pilot Program be **produced or manufactured** within the area designated by the regional center," (emphasis added).[4] The petitioner concludes that the credit company may extend loans to any export-related company located anywhere.

Such an interpretation renders the geographical limitation of a regional center meaningless. The definition of "regional center" in 8 C.F.R. § 204.6(e) requires that the economic unit be involved in "improved regional productivity." 8 C.F.R. § 204.6(m)(3)(i) states that, in order to gain approval as a regional center, an entity must describe clearly how it will promote economic growth through "improved regional productivity." If neither the credit company nor the export-related businesses are located in the regional center, it is difficult to see how the productivity within the regional center is being improved.[5]

As the subsidiary credit corporation's actual and proposed loan activities benefit companies outside the geographical area covered by the regional-center designation granted in this case, the petitioner must estab-

---

[4]Not all export-related businesses produce or manufacture their own goods. For example, if a bank located within the regional center were to lend money to a company that exported chicken parts to Russia, the chickens would not have to have been raised within the specific geographical area; the export company would have to be located within the area, however. Similarly, the bank could permissibly lend money to a company located in the geographical area that exported cosmetics, jeans, and American rice to Japan; these products would likely not have been produced or manufactured within the area. It is not sufficient for just the bank, or the bank's primary shareholder, to be located in the regional center

[5]Even if the credit company here were located within the regional center rather than in Atlanta, the arrangement would still not qualify. The only improved regional productivity would concern the salaries of a few loan officers; this is not what was intended by the regional-center provisions.

lish direct employment creation; he cannot rely on indirect employment creation. For the sake of argument, however, the AAU will analyze the investment portion of this case using his claim of indirect employment creation.

## CERTAIN REVISIONS TO THE PARTNERSHIP AGREEMENT CANNOT BE ACCEPTED

Subsequent to the issuance of the director's decision, counsel has submitted numerous revisions to AELP's limited partnership agreement. He explains that the revisions are in the form of Stage I and Stage II amendments.

The original partnership agreement had been prepared and executed in March of 1996, prior to the creation of an initial payment option of $120,000. When the $120,000 option was added to AELP's program in the fall of 1996, AELP neglected to amend the partnership agreement. As a result, many provisions within the documents signed by this petitioner contradict provisions within the official partnership agreement. The Stage I amendments are intended to correct these inconsistencies.

In addition, after the attorneys for AELP obtained a copy of a memorandum issued in December of 1997 by the Service's Office of General Counsel ("OGC"), "the Limited Partnership Agreement of AELP was further amended to restructure, amend or eliminate some or all of [the] 'objected-to' provisions." These Stage II amendments, counsel continues, should render the instant petition approvable.

A petitioner must establish eligibility at the time of filing; a petition cannot be approved at a future date after the petitioner becomes eligible under a new set of facts. *See Matter of Katigbak*, 14 I&N Dec. 45, 49 (Comm. 1971), Therefore, a petitioner may not make material changes to a petition that has already been filed in an effort to make an apparently deficient petition conform to Service requirements.

Counsel states that petitions have previously been amended to reflect program changes and to cure defects in the original documents. He refers to a 1995 case in which the center director had correctly found that the business at issue did not constitute a troubled business. At oral argument in that case, counsel presented a completely different business plan that abandoned the troubled-business claim and substituted a plan to create a new business instead. This new business plan formed the basis of an approval. The case referenced by counsel, however, resulted in an unpublished decision that did not have any precedential value, procedural or otherwise. Furthermore, the AAU acknowledges that acceptance of the new business plan at such a late date was improper and erroneous.

In the case at hand, the AAU will recognize the Stage I amendments to the extent that they cause the partnership agreement to conform to the other

agreements that this petitioner had originally executed and submitted with his Form I-526. The AAU will make no determination as to the adequacy or inadequacy of the Stage II amendments, as they are irrelevant in this proceeding; the Service cannot consider facts that come into being only subsequent to the filing of a petition. *See Matter of Bardouille*, 18 I&N Dec. 114 (BIA 1981). If counsel had wished to test the validity of the newest plan, which is materially different from the original plan, he should have withdrawn the instant petition and advised the petitioner to file a new Form I-526. The case shall be analyzed only on the basis of the original documents and the revisions that correct the original inconsistencies.

## THE PETITIONER HAS NOT MADE A QUALIFYING "INVESTMENT"

8 C.F.R. § 204.6(e) states, in pertinent part, that

*Capital* means cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided the alien entrepreneur is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness. All capital shall be valued at fair market value in United States dollars, ...

*Commercial enterprise* means any for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned. This definition includes a commercial enterprise consisting of a holding company and its wholly-owned subsidiaries, provided that each such subsidiary is engaged in a for-profit activity formed for the ongoing conduct of a lawful business. This definition shall not include a non-commercial activity such as owning and operating a personal residence.

*Invest* means to contribute capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital for the purposes of this part.

8 C.F.R. § 204.6(j) states, in pertinent part, that:

(2) To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petitioner is actively in the process of investing. The alien must show actual commitment of the required amount of capital. Such evidence may include, but need not be limited to:

(i) Bank statement(s) showing amount(s) deposited in United States business

account(s) for the enterprise;

(ii) Evidence of assets which have been purchased for use in the United States enterprise, including invoices; sales receipts; and purchase contracts containing sufficient information to identify such assets, their purchase costs, date of purchase, and purchasing entity;

(iii) Evidence of property transferred from abroad for use in the United States enterprise, including United States Customs Service commercial entry documents, bills of lading and transit insurance policies containing ownership information and sufficient information to identify the property and to indicate the fair market value of such property;

(iv) Evidence of monies transferred or committed to be transferred to the new commercial enterprise in exchange for shares of stock (voting or nonvoting, common or preferred), Such stock may not include terms requiring the new commercial enterprise to redeem it at the holder's request; or

(v) Evidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by assets of the petitioner, other than those of the new commercial enterprise, and for which the petitioner is personally and primarily liable.

Counsel states that the petitioner has made an investment of $500,000 in the form of a $500,000 promissory note. This note provides for an initial deposit of $120,000 into an escrow account, to be released to the partnership upon approval of the immigrant visa, five annual payments of $18,000, and a final balloon payment of $290,000.

## Initial Partnership expenses

On October 14, 1997, Wells Fargo Bank notified the petitioner that his funds in the amount of $120,000 had been received and deposited into a custody account for the Partnership. According to section 2.A(3) of the investment agreement, the petitioner agreed to instruct counsel, as trustee of his escrow account, "immediately to release US$30,000 as a refundable advance for initial expenses of the Partnership"; the remaining $90,000 would be released upon approval of the visa application. As pointed out by the director on page 4 of his decision, the use of the $30,000 for Partnership costs and expenses meant that the full $500,000 would not be "infused into the commercial enterprise for the purpose of employment creation."

In response, the petitioner states that it is possible that the director objected to the expenses being released from the escrow account and that the director might not have objected if the expenses had been paid after the funds were released from escrow. Regardless of the timing of the payment, the ultimate payee is the Partnership, the petitioner maintains. The timing

of the payment, however, was not the director's objection. The director cited 8 C.F.R. § 204.6(j)(2) in stating that the required amount of capital must be placed at risk "for the purpose of generating a return on the capital placed at risk." As the payment of initial Partnership expenses and costs was not the type of profit-generating activity contemplated by the regulations, no more than $470,000 could be considered to have been "invested."

The petitioner argues that fees and expenses incurred in the process of raising capital are customary and reasonable. For example, when businesses go to banks for money, the banks charge processing fees, points, appraisal fees, and other expenses that are included in the debt. The petitioner continues:

> It is absurd to suggest that there is no cost to creating an immigrant investor program (attorneys fees, accountant fees, and administrative fees), there is no cost to raising money in the market place (finders fees, immigration consultant fees, forwarding fees, and so forth); and that there are no ongoing administrative and operating expenses during the initial start up phase of the business (rent, utilities, telephones, fax machines, office furniture, personnel costs, executive salaries, etc.), We live in a world of reality, not "make believe."

The petitioner refers to AELP's subsidiary credit company having retained an expert in asset-based loans for an annual salary "in excess of $200,000." What is important, the petitioner emphasizes, is that the money spent by AELP on initial expenses is in furtherance of the Partnership business.[6]

While points and processing fees are often financed, they are considered an amount over and above the original loan amount. To illustrate, when a person intends to obtain a mortgage for $200,000, he can choose to pay the points and fees separately or he can choose to finance them. If he chooses to finance the fees, the principal on his mortgage is no longer just $200,000 but something more. In the investor context, the Service is not prohibiting the payment of Partnership expenses; rather, the Service is finding that if AELP wishes to have the limited partners pay these expenses, these expenses must be paid in addition to the $500,000.

The petitioner explains that AELP deducts its operating expenses of $30,000, and the remaining funds go to the subsidiary credit corporation. The credit corporation then deducts its own expenses and the leftover money is contributed to a lending fund from which the loans to export companies are made. The petitioner contends that the new commercial enter-

---

[6]Nevertheless, counsel appears to be prepared to abandon these numerous arguments. In his brief on behalf of the petitioner, counsel states that if the AAU finds that providing for the payment of initial expenses from and out of capital contributed by the investor is improper, then AELP will immediately amend its partnership agreement to eliminate the provision from its program.

prise here is the Partnership, AELP, and an investment of $500,000 in AELP constitutes an investment of $500,000 in the new commercial enterprise, "It was never AELP's intent...that 100% of the funds contributed by the foreign national investors would flow through the partnership and into the credit corporation for lending to U.S. export businesses." After AELP and the credit corporation deduct tens of thousands of dollars for their "expenses," however, it is not clear how much of the original money is made available for loans.

It could perhaps be argued that, when the owner of a corporation pays a million dollars for shares in his business and earmarks the money for equipment, inventory, and working capital, some of the working capital will in fact be spent on initial salaries and expenses. In the partnership scenario, the new commercial enterprise is the partnership, and it too will need to spend money on initial salaries and expenses. The Service distinguishes these two situations in that, in the former example, the employment-creating entity is spending the money. In the latter example, the employment-creating entity never receives the money spent on the partnership's expenses. Especially where indirect employment creation is being claimed, and the nexus between the money and the jobs is already tenuous, the Service has an interest in examining, to a degree, the manner in which funds are being applied. **The full amount of money must be made available to the business(es) most closely responsible for creating the employment upon which the petition is based.**[7] The Service does not wish to encourage the creation of layer upon layer of "holding companies" or "parent companies," with each business taking its cut and the ultimate employer seeing very little of the aliens' money.

In his brief on behalf of the petitioner, counsel claims that the deduction of AELP's and the credit company's expenses had previously been disclosed to, and approved by, the Service when the Service approved the general partner's designation as a regional center. The focus of an inquiry into the designation of a regional center, however, has to do with whether proposed activities will improve regional productivity through increased exports; it has nothing to do with the propriety of various business expenses and how they are funded. Counsel also claims that the same facts were disclosed within the past few months, both in writing and during a conference attended by AELP representatives and Service attorneys. Disclosure, though, does not mandate approval.

---

[7]Whether or not $500,000 must be made available for the loans to export companies or whether $500,000 must merely be made available to the credit corporation extending the loans, it is clear that making $500,000 available to **AELP** is not sufficient. AELP's primary purpose is apparently to locate potential alien investors. AELP does not extend the loans to the export companies and is not the entity most closely engaged in employment creation, indirect or otherwise.

In his brief on behalf of the petitioner, counsel cites a 1995 case in which the Vermont Service Center had questioned whether $80,000 or $90,000 set aside for fees could be considered an investment of capital. On May 25, 1995, the Administrative Appeals Unit approved the case. Counsel further states, "During oral argument an AAU official stated that it was proper to deduct such fees from the amount of the capital contributed by the investor without thereby reducing the investor's contribution of capital."

The decision rendered by the AAU in that case did not specifically address the issue of fees. In addition, the decision in that case was unpublished and has no precedential value.

### Annual payments

According to section 2B of the investment agreement executed by the petitioner, the petitioner must make five annual cash payments of $18,000 each, totalling $90,000, commencing one year from the date he is admitted to the Partnership.

Section 3 of the investment agreement, however, states, "I shall receive a return on the cash I have contributed to the Partnership in the amount of 12% per annum, payable annually, commencing one year from the date I am admitted to the Partnership as a Limited Partner and ending five years thereafter."[8] The petitioner would also receive a share of any profits exceeding this 12-percent return. The partnership agreement explains that the percentage return is computed on the basis of the total cash contributed at the time the distribution is made. In other words, the petitioner's first annual distribution would be at least $14,400 (12 percent of $120,000, plus any additional profits), his second annual distribution at least $16,560 (12 percent of $138,000), his third at least $18,720, his fourth at least $20,880, and his fifth at least $23,040.

In effect, the $90,000 that the petitioner's annual payment obligation represents would require very little in new, personal funds. To make his first annual payment of $18,000, the petitioner would have to contribute no more than $3,600 of his own funds to the $14,400 (or more) he would receive from the Partnership. To make his second payment, the petitioner would have to contribute no more than $1,440 of his own funds to the $16,560 he would receive from the Partnership. The petitioner's third, fourth, and fifth payments, however, would be entirely covered by his guaranteed distributions from the Partnership; in fact, the petitioner would be at least $8,640 ahead for these last three years.

---

[8]The original partnership agreement, however, provides that this return is **10** percent per year, payable for **four** years. Counsel does not submit a Stage I amendment for this inconsistency.

The petitioner's obligation to make his annual payments is conditioned upon the Partnership making the guaranteed annual distributions to the petitioner.[9] As such, these annual payments do not constitute a contribution of capital.[10]

The petitioner refers to the OGC memorandum of December 19, 1997, which had criticized the use of profits generated by a business to meet obligations under a promissory note. The petitioner contends that he is entitled to use his guaranteed return for whatever purpose he desires, and it would be absurd to segregate dividends or profits in a special account to guarantee that they would not be used to make payments on the note.

The AAU does not at this time reach the issue of whether it is ever appropriate for a business to distribute profits to an alien who still owes money to the business. The problem addressed here is that the annual returns are **guaranteed**. The fact that title to that money changes hands does not change the essence of the transaction; as the director pointed out in his decision, the Partnership receives no infusion of new funds from the petitioner.

Another problem with guaranteed annual distributions is the source of the distributions. As the petitioner concedes on page 70 of his brief, "[i]t is unlikely that the business will be immediately profitable from the lending activities contemplated by AELP and its credit corporation subsidiary." Since there is never a guarantee that the Partnership will generate sufficient profits during any given year to pay each investor his 12-percent guaranteed distribution, the possibility exists that the distributions may be drawn from the contributions of future limited partners (thereby necessitating the acquisition of more and more limited partners) or from the contributions already made (thereby depleting the initial contributions).

At pages 70 and 71 of his brief on behalf of the petitioner, counsel counters, "The payment of this guaranteed return is an obligation of the partnership which may or may not be met. If the partnership does not have the ability to make such annual payments, they will not be made." As mentioned earlier, this is directly contradicted by section 2.C of the investment agreement, which provides that the failure of the Partnership to make the

---

[9]Section 2.C of the investment agreement states, "In the event of the bankruptcy, the insolvency, or the failure of the partnership to pay the annual return on capital, to pay the sell option price, or to pay any judgment, the Partnership shall be deemed to be in breach of its obligations to the Limited Partners under the American Export Limited Partnership Agreement, and I, as a Limited Partner, shall have no further obligations to the Partnership, and furthermore, I shall not be obligated to make any further cash payments under the Limited Partnership Agreement, this Investment Agreement or the Promissory Note."

[10]At most, one could argue that the petitioner must make an initial outlay of $5,040 for the first two payments; but because this amount would be more than offset by the last three guaranteed distributions from the Partnership, this initial outlay is, in effect, a loan. 8 C.F.R. § 204.6(e) specifies that contributions of money in exchange for debt arrangements do not qualify as "investments."

annual distributions is considered a breach of the Partnership's obligations and will cause the petitioner not to have to make any further cash payments.

The petitioner states that Service administrative case law exists supporting a petitioner's application of guaranteed annual returns paid by a partnership toward meeting the petitioner's obligation to make annual payments to the partnership. The petitioner cites an unpublished AAU decision from 1995 involving the "C&W Hotel Management program." While the center director's decision in that case had referred to a provision in the business plan stating that four annual payments might come from the profits of the business, the center director did not note whether these so-called "profits" were in the form of *guaranteed* returns (which would then have no direct connection to profit, as discussed above), and he did not make any finding as to the propriety of this provision. Review of the AAU decision reveals no reference whatsoever to annual returns or annual payments. Therefore, it cannot be said that the AAU has specifically sanctioned the use of guaranteed annual returns toward meeting obligations to make annual payments. More significantly, the AAU decision in question was unpublished and has no binding precedential authority.[11]

The petitioner points to an internal Service memorandum issued on October 20, 1997, by the Office of Adjudications. This memorandum stated that in some cases, guaranteed interest payments were made through outside loans or from capital contributed by other investors; as not all businesses could be profitable immediately, a contractual provision for guaranteed payments may, in certain cases, be consistent with a genuine investment.[12] This memorandum was a general statement of policy and did not analyze any particular fact patterns. Indeed, the statements in the memorandum were qualified with the words "may" and "in certain cases." Given the confusing statements contained in the memorandum, and the lack of guidelines provided, this memorandum provides no assistance in resolving the present case.

In short, because the petitioner is guaranteed annual distributions from the Partnership of at least 12-percent for five years, which would yield him $93,600, the petitioner's five annual payments totalling $90,000 under the promissory note cannot be considered a qualifying contribution of capital.[13]

---

[11]The AAU recognizes that the Service has approved plans that may have contained guaranteed annual returns. If so, such approvals were in error for the reasons stated in this decision.

[12]This recent memorandum was superseded by a subsequent memorandum dated March 11, 1998, however.

[13]In apparent recognition of the fact that the petitioner is not contributing capital through the five annual payments, the investment agreement provides, at section 6, that if the conditions of the petitioner's permanent resident status are not removed, the Partnership will refund the petitioner $120,000. Presumably, by the time the petitioner applied for removal of his conditions, he would have made at least one of the annual payments and contributed $138,000.

The petitioner has effectively shifted the risk of loss of the $90,000 from himself to the Partnership.

## Redemption agreement

Section 4 of the investment agreement provides, "after the sixth anniversary of my admission to the Partnership, I, as a limited partner, may exercise a sell option under which I have the **right to require** the Partnership to purchase from me my limited partnership interest," (emphasis added).[14] The sell-option price is equal to the petitioner's total contributed capital, less the first six payments, plus a pro rata share of profits. In other words, the sell-option price is $290,000 plus profits. Or, to look at it from the petitioner's perspective, the price of permanent resident status is $116,400 minus profits; as discussed above, the five annual payments are more than fully covered by the annual distributions and do not require any expenditure on the part of the petitioner. At the same time, the Partnership may exercise a buy option for the same price.[15]

Section 4 of the investment agreement specifies that the sell-option price is "payable as soon as the sell option is exercised." Section 8.05C of the original partnership agreement, however, states that the price is payable 180 days after the exercise of the sell option. The revised partnership agreement, instead of conforming to the investment agreement, reiterates the 180-day deadline. While the Stage I amendments were intended to reflect the actual intent of the parties, the petitioner has not executed a new investment agreement or otherwise indicated that he agrees with the new partnership agreement and is willing to wait 180 days.

It is not clear whether the petitioner is obligated actually to make the last payment of $290,000 if he exercises his sell option; both his responsibility to pay and his right to sell ripen at the same time. Section 8.05C of the partnership agreement provides that once the Partnership pays the sell-option price, "all amounts owed under such Selling Limited Partner's Investor Note shall be deemed satisfied by the Partnership..." Similarly, under section 8.06C, after the Partnership pays the buy-option price, "all

---

[14]The original partnership agreement states that the sell option is exercisable after five years; the revised agreement, pursuant to a Stage I amendment, states that the sell option is exercisable after six years in the case of a limited partner who makes an initial cash payment of $120,000.

[15]Section 8.06 of the original partnership agreement states that this "buy option" is exercisable after **three** years. Pursuant to Stage II amendments, the partnership agreement now states that the buy option is exercisable one year after the petitioner completes his payments under the note, or **seven** years. The revised partnership agreement also mentions sell-option prices of "$410,000? $290,000?" [sic],

amounts due and owing under the Investor Note shall be discharged by the Partnership..." It is not known what amount would still be owed if the petitioner is obligated to pay the $290,000 prior to the exercise of the buy or sell option. If the petitioner can avoid making this last payment by exercising his sell option, this amount of $290,000 cannot be considered to have been placed at risk.

Even if the petitioner is obligated to make this balloon payment prior to exercising his sell option, the $290,000 still cannot be said to be at risk because it is guaranteed to be returned, regardless of the success or failure of the business. If the investment agreement executed by the petitioner is controlling, then the moment he made this last payment, the petitioner could exercise his sell option, and the money would be immediately returned; the amount of $290,000 would never be at risk. If the partnership agreement is controlling, then the petitioner's agreement to make this payment of $290,000 is, in essence, a debt arrangement in which he provides funds in exchange for an unconditional, contractual promise that it will be repaid later at a fixed maturity date (six months later). Such an arrangement is specifically prohibited by the regulations. *See* 8 C.F.R. § 204.6(e).

In its opinion dated December 19, 1997, OGC engaged in a lengthy discussion of the factors evidencing debt and equity in the context of tax law; the opinion cited various tax cases and concluded that the debt characteristics of a plan such as AELP's outweighed any equity characteristics. The AAU finds such a discussion unnecessary and not particularly helpful with respect to this matter. The considerations at issue here are not the same as those of a court attempting to ascertain whether a business is attempting to evade taxes. Furthermore, the businesses examined in those tax cases were standard businesses not created for the purpose of enabling aliens to obtain immigration benefits. As counsel conceded at oral argument, potential alien investors are

> not going to make this investment, under *any* circumstances, unless they get a green card. If anybody ever suggests that this is a wonderful investment and they're going to make it without getting lawful permanent residence, they're lying and they're crazy; they're brain-damaged, all right? Nobody is gonna do this without getting a green card. That was the intent of the law. That's the carrot; that's the quid pro quo.

In other words, AELP has created a program to which most people would be unwilling to subscribe.[16] A discussion of the numerous debt and equity factors set forth in the tax cases unnecessarily complicates the

---

[16]This, by itself, raises the question of whether the AELP plan is a genuine investment. If normal investors would be unwilling to participate in this program because the chance for a net monetary gain does not exist, then it is logical to conclude that the hoped-for "profit" inherent in this program is the green card itself.

attempt to ascertain the true substance of the transaction. Very simply, the payment of the $290,000 constitutes a straight loan; the petitioner would be making this money available to AELP with the contractual expectation that it would be returned to him six months later. The risk that the petitioner might not receive payment if the Partnership fails is no different from the risk any business creditor incurs.

Counsel states on page 30 of his brief on behalf of the petitioner, "The payment of the sell-option price was dependent upon the Partnership's ability and willingness to pay. Thus, substantial risk existed in that the Partnership might be unable or unwilling to pay the investor."  At oral argument, counsel claimed that the redemption provisions were entirely unenforceable; no partner could bring a lawsuit to enforce them. Aside from the question of why not, counsel's statements raise questions of good faith. For AELP to entice aliens to invest in AELP by promising them redemption rights, but then for counsel (who is counsel for both AELP and the petitioner) to suggest in his brief that AELP might not be "willing" to honor the redemption rights, and to add at oral argument that the redemption provisions are not enforceable anyway, is disturbing. While most normal investors in the business world realize that they risk losses due to business downturns, the aliens participating in AELP may not realize that their attorney believes that their risk instead involves the refusal of their attorney's other client to comply with the written contract it executed with them. The Service cannot endorse illusory promises and does not recognize this type of "risk" as the kind of risk contemplated by 8 C.F.R. § 204.6(j)(2).

More importantly, the AAU must look to the plain language of the documents executed by the petitioner and not to subsequent statements of counsel; these documents provide the petitioner with the right to redemption and a certain price. As mentioned earlier, section 2.C of the investment agreement specifies that the failure of AELP to pay the sell-option price constitutes a breach of AELP's obligations to its limited partners.

In its memorandum of September 10, 1993, OGC stated its opinion at page 8 that it was "entirely appropriate for an alien to enter into an agreement with the investment fund whereby the seller agrees to repurchase the investor's shares upon, but not before, removal of the conditional basis of the alien's permanent residence."  OGC qualified this statement by adding that such a redemption agreement "may not be used as a vehicle to avoid or reduce the risk of capital loss to the alien investor during the two-year period of conditional residency."  To ensure that the capital remained at risk during the two-year period, OGC believed that the repurchase agreement should expressly provide that the price of the shares to be resold could not exceed the fair market value of the shares at the time of repurchase; "[a]ny other repurchase arrangement would impermissibly shift the risk of loss from the investment from the alien to the party promising to buy back the alien's interest in the investment."  In a subsequent memorandum dated

185

June 27, 1995, OGC explained at page 10 that such a redemption agreement was permissible "since the alien risks losing all or part of his own capital in the event the fair market value of the investment has fallen at the time of the repurchase."

The AAU does not entirely agree with the opinions of OGC. To enter into a redemption agreement at the time of making an "investment" evidences a preconceived intent to unburden oneself of the investment as soon as possible after unconditional permanent resident status is attained. This is conceptually no different from a situation in which an alien marries a U.S. citizen and states, in writing, that he will divorce her in two years. The focus here is on the green card and not on the business. Despite counsel's repeated claims that the Service's current position is hurting U.S. workers and U.S. businesses, and despite counsel's accusations regarding the Service's allegedly cavalier attitude toward them, one could argue that an alien who enters into a redemption agreement considers the continued success of the U.S. workers and U.S. businesses secondary. His primary concern is obtaining permanent resident status for as little money as possible.

For the alien's money truly to be at risk, the alien cannot enter into a partnership knowing that he already has a willing buyer in a certain number of years, nor can he be assured that he will receive a certain price. Otherwise, the arrangement is nothing more than a loan, albeit an unsecured one.

The fair-market-value limitation on the sale price referenced by OGC, while well-intended, is not workable. It is not clear how this fair market value would be determined. For example, at page 31 of his brief on behalf of the petitioner, counsel discusses the two five-year payment options offered by AELP prior to the offering of the $120,000 option subscribed to by this petitioner. "Since the AELP sell-option prices were either $150,000 or $140,000 less than the $500,000 cash contribution recently completed, it seemed obvious that the sell-option prices would be substantially below fair market value." The only reason this would be "obvious" would be if counsel already knew what the fair market value would be in five years. True fair market value cannot be known five years in advance. Fair market value assumes the existence of a market. In this case, no public market exists for the AELP partnership interest. The sale of the partnership interest would not be an arms-length transaction, and the valuation of the parties would not reflect a true fair market value.

The AAU does not find that an alien investor may never sell back his partnership interest. Rather, the AAU finds that, prior to completing all his cash payments under a promissory note (whether to the partnership or to some third-party lender), an alien investor may not enter into any agreement granting him the right to sell his interest back to the partnership. In no event may he enter into such an agreement prior to the end of the two-year period of conditional residence. An investment assumes that a risk exists. The

alien must go into the investment not knowing for sure if he will be able to sell his interest at all after he obtains his unconditional permanent resident status; and if he is successful in selling his interest, the sale price may be disappointingly low (or surprising high and more than what he paid), This way, the alien risks both gain and loss. To allow otherwise transforms the arrangement into a loan.[17]

The petitioner contends that the AAU, in the unpublished C&W decision from 1995, had previously considered the issue of whether a structure identical to AELP's constituted a debt arrangement. According to the petitioner, the Vermont Service Center had found that the plan in question appeared to represent a good-faith commitment on a debt agreement, and representatives of the AAU "advised that they had analyzed the investment agreements and had concluded that the C&W program did not constitute a debt arrangement." "The C&W decision reversing the Vermont Service Center and ordering that the petitions be approved rejects the argument that this structure constitutes a debt arrangement," the petitioner continues.

The petitioner misreads the decisions. The Vermont Service Center's statement regarding a "good faith commitment on a debt agreement" was a reference to a comment in the Federal Register from someone suggesting that the Service "should state in the regulations that a good faith commitment on a debt agreement, *which is secured by the alien entrepreneur's assets*, should suffice to meet the requirement that the alien entrepreneur has, in good faith, substantially met the capital investment requirement..." (emphasis added). In other words, the "debt agreement" referred to by the Vermont Service Center was the promissory note executed by the *petitioner*, who had agreed to make cash payments to the partnership; as such, the "debt" at issue was the petitioner's debt to the partnership, not the partnership's subsequent debt to the petitioner. Neither the center decision nor the AAU decision specifically considered whether the investment structure at issue involved a prohibited debt arrangement (i.e., loan) as is at issue here. Neither decision made reference to a sell option.

The petitioner points to another program, which he calls the "Pardini/Tony Roma program." According to the petitioner's counsel, the California Service Center stated, in a notice of intent to deny, that the effect of the partnership arrangement appeared to be "a series of loans called investments made by the Limited Partners, the foreign investors, to the General Partner who is to be repaid by the General Partners at 10% interest." Brief at 54. Counsel claims that, in his response, he set forth the AAU decision in C&W; "[t]he AAU's rejection of the debt arrangement argument proved persuasive to the California Service Center, which in turn rejected

---

[17]More precisely, the AAU finds that the AELP plan contains, as one of its many features, a loan of $290,000. This amount of $290,000 cannot be considered an "investment."

the 'debt' argument and approved the Pardini/Tony Roma investor petitions."

As noted above, the AAU's C&W decision did not address the issue of loans extended by the limited partners to the partnership. Therefore, the California Service Center would have been in error if it had relied on the C&W decision to conclude that the Tony Roma plan did not involve an impermissible debt arrangement. Moreover, the C&W decision was unpublished and, even if it were relevant to Tony Roma or to this case, would not have any binding precedential value. Furthermore, even if the Service has, in the past, approved petitions that contained redemption agreements, these approvals were in error because the Service now recognizes that such agreements are in fact debt arrangements.

> The petitioner also refers to an internal Service memorandum from October 20, 1997, in which appears the following statement:
> On the other hand, absent evidence to the contrary, where the agreement does not specifically grant the investor the option to sell or the new commercial enterprise to buy out the investment before the balloon payment is due, an adjudicator may not deny the petition based on a finding that the investor will not exercise a sell (or the new commercial enterprise a buy-out) option before the due date on the balloon payment.

This statement makes no sense and certainly does not support the petitioner's contentions. The petitioner characterizes this memorandum as "all-important"; far from being "all-important," this memorandum was meant only to provide general policy statements, not to analyze specific fact patterns.[18]

As far as the petitioner's criticism that the Texas Service Center's decision in this case failed to mention, distinguish, or explain away the above prior decisions and OGC opinions, it is not clear why the center director would reference them at all. Neither of the above decisions had any precedential value, and neither case originated from the Texas Service Center. OGC memoranda, as counsel himself stated after oral argument, are merely opinions. OGC is not an adjudicative body and is in the position only of being an advisor; as such, adjudicators are not bound by OGC recommendations. *See* 8 C.F.R. § 103.1(b)(1).

Because the petitioner here has entered into an agreement to pay $290,000 in exchange for a promise that he can receive the $290,000 back six months later, he has in effect entered into a debt arrangement as prohibited by 8 C.F.R. § 204.6(e).[19] The $290,000 cannot be considered to have been properly "invested" and is not at risk.

---

[18]Furthermore, as mentioned earlier, this memorandum was superseded by another memorandum less than five months later.

[19]Again, this is assuming that the partnership agreement is the controlling document. If the investment document executed by this petitioner is controlling, then the money must be returned immediately and not after six months.

**Cash reserves**

The definitions section and section 4.04 of the original partnership agreement state that the general partner may deposit portions of the limited partners' capital contributions, designated as "reserve funds," in escrow or sub-escrow accounts. According to section 4.04.A(i) of the agreement, the banks holding these accounts shall invest the funds "in securities or other financial instruments and obligations in amounts sufficient to satisfy the requirements of **Section 8.05**," (emphasis in original). Section 4.04.B adds that the general partner "shall deposit with the Banks from the Initial Cash Payments sufficient Reserve Funds to satisfy the Partnership obligations under **Section 8.05** and to defray such costs and expenses of the Partnership as determined by the General Partner," (emphasis in original), Section 8.05 of the partnership agreement is entitled "Limited Partner Sell Option" and sets forth the timing and price of the sell option.

Section 4.03.B explains that after all the requirements of section 4.04.B are satisfied, any funds remaining from the initial cash payments and all subsequent capital contributions may be used to meet the obligations of the Partnership, as determined by the general partner in its sole discretion, with any excess to be used in the business of the Partnership.

In other words, pursuant to the above sections of the original partnership agreement, the general partner would be obligated to deposit sufficient portions of the initial $120,000 and/or the remaining $380,000 into the reserve funds such that the deposits and their earnings (from securities or other financial instruments) would enable the Partnership to fulfill its own obligations to buy back Partnership interests. The creation and maintenance of these reserve funds take priority over any other use of the capital contributions. Under these terms, any leftover money would be used for other Partnership obligations, and whatever was left thereafter would then be used for business activities. As the director stated in his decision, these reserve funds are, by agreement, not available for purposes of job creation and therefore cannot be considered capital placed at risk for the purpose of generating a return on the capital being placed at risk.

In his brief, the petitioner claims, "It is estimated in the business plans of AEP [the general partner] that no more than 10% of the total amount invested will ever be placed in bank accounts as reserves." The petitioner argues that since the sell-option price is $290,000, the initial payment of $120,000 and the installment payments totalling $90,000 would never become the subject of reserve accounts because they would yield an insufficient amount ($210,000) to cover the sell-option price. As such, these payments would be able to be used fully by the Partnership. Furthermore, the petitioner points out that if all of the limited partners' initial contributions and annual payments had been withheld as cash reserves, the subsidiary credit corporation could not have extended the

loans that it has.[20]

First, the partnership agreement states that the reserve funds are supposed to be invested in securities and other financial instruments, so the amount withheld from the capital contributions would not necessarily have to be $290,000. Second, the reserve provisions do not say that the reserves deducted from the contributions of a limited partner must be used to pay the sell-option price to that same limited partner; reserves drawn from later partners could conceivably be used to help pay the sell-option price to earlier partners.

Third, the reserve provisions probably have more significance as far as the final balloon payment of $290,000 than with respect to the initial payments. This final payment might have to be returned to the limited partner within six months, and the Partnership has a contractual obligation under sections 4.04.A(i) and 4.04.B to reserve sufficient funds to meet its redemption obligation of $290,000.[21] This is assuming, of course, that the partnership agreement is controlling; if the investment agreement executed by the petitioner is controlling, the money would be returned immediately instead of six months later.

In his brief, the petitioner states that in 1992 a Service official had delivered to counsel a model EB-5 investor petition that had been approved; at oral argument, counsel added that he was assured that if he followed this model petition, his petitions would also be approved. According to the petitioner, the one million dollars in capital invested in that case "would create reserves for inventory, working capital, expansion, and other partnership expenses, in the sum of *$450,000*. Thus, the model petition established that $450,000 of the $1,000,000 to be invested, or 45%, would be set aside as bank reserves."

The record does not contain a copy of this "model petition," and the AAU cannot ascertain whether the cash reserves in that case were mandatory or inadvertent, temporary or long-term. The opinions of one Service official, moreover, cannot work to remove from the AAU's jurisdiction the authority to review individual cases. *See* 8 C.F.R. § 103.1(f)(3)(iii), The Service does not pre-adjudicate investor petitions;[22] each petition must be adjudicated on its own merits. The fact that a particular petition (which did not result in a precedent decision) was considered qualifying in 1992, when the Service was less experienced with these types of cases, has no bearing

---

[20]The credit company has only extended four loans to date, totalling $1,361,000. Capital contributions of $500,000 from the 95 previously-approved petitioners would yield $47.5 million available for loans.

[21]Even if, after six years, the petitioner elected to remain in the Partnership instead of exercising his redemption option, the reserve provisions would still preclude the capital from being placed at risk during the two-year conditional period, as required by the regulations.

[22]Cf. 8 C.F.R. § 214.2(l)(2)(ii) regarding non-immigrant L-1 blanket petitions.

on whether the reserve provisions in question here should also be considered qualifying.

> Counsel explains in his brief on behalf of the petitioner:

> It was discovered by AELP that the Limited Partnership Agreement may be interpreted to require the creation of reserves in order to enable the Partnership to perform its obligation to pay the sell-option price to investors who exercised the sell-option obligations. It was never the intention of the Partnership to require the maintenance of reserves for this purpose.

Therefore, he states, pursuant to Stage I amendments the reserve provisions have since been eliminated.

The plain language of section 4.04.B of the original partnership agreement, however, clearly states that the general partner "shall" deposit sufficient reserves for the purpose of enabling the Partnership to meet its obligations under the sell-option agreement; the reference to the section pertaining to the sell option is even in bold face. It is difficult to imagine what the intent of this provision could be other than to require the creation and maintenance of reserves for such purpose. The assertion that the deletion of the reserve provisions is a Stage I amendment is not well taken; this revision does not conform the partnership agreement to the investment agreement executed by the petitioner and is a material change in position from the original partnership agreement. It is more in the nature of an unacceptable Stage II amendment.[23] (See earlier discussion of revisions to the partnership agreement.) Even if the issue of cash reserves were the sole ground for denial, the elimination of the cash-reserve requirement could not form the basis of an approval of *this* petition.

### Fair market value of promissory note, schedule of payments

As stated in 8 C.F.R. § 204.6(e), **all** capital must be valued at fair market value in United States dollars. Counsel claims that the petitioner has made a capital contribution of $500,000 because he has executed a promissory note for $500,000. One issue to be examined when determining the fair market value of a promissory note is whether it is adequately secured.

According to the Secured Promissory Note executed by the petitioner on October 14, 1997, the obligation of the petitioner to make payments is secured by the petitioner's personal assets, "which are identified in the Attachment hereto." The promissory note does not include any document entitled "Attachment," although the record does contain a Summary of Bank Account Balances. This summary does not specify that the bank

---

[23]The investment agreement is silent as to cash reserves.

accounts listed are securing the note.

The summary and accompanying bank statements verify that the petitioner's accounts at Sumitomo Bank in Japan contained a total of $42,376.70 as of October 3, 1997; the petitioner's savings accounts at Sanwa Bank in Japan contained a total of $500,558.60 as of October 6, 1997; the petitioner's checking account at Sanwa Bank in California contained $70,985.80 as of October 10, 1997; and the petitioner's account at South Bay Bank in California contained $51,500 as of October 14, 1997. The Summary states that these accounts represent a total of $665,421.10 in funds.[24]

Assuming, arguendo, that the bank accounts do constitute the security for the promissory note, the petitioner has not demonstrated how AELP could reach the funds in the overseas accounts if the petitioner were to default, and it is not clear what expenses and effort would be involved. In the absence of such information, and in the absence of any details regarding the laws of Japan and the enforceability, by U.S. entities, of security interests taken in Japanese bank accounts, the petitioner has failed to establish that the security interest in the foreign accounts has any value.

More importantly, funds in bank accounts can easily be dissipated. As none of the above accounts is, for example, an escrow account or trust account in favor of AELP, no guarantee exists that the money contained in the accounts would remain there for the entire six years over which the petitioner would be obligated to make payments on the promissory note. For this reason, too, the petitioner has failed to show that his promissory note is adequately secured.

The fair market value of a promissory note also depends on the terms of the note itself. The petitioner contends that the promissory note at issue here is for $500,000, not $380,000; he urges the Service not to view his contribution as an initial payment of $120,000, plus annual payments totalling $90,000, plus a balloon of $290,000. The petitioner states that the regulations allow him either to have already invested or to be in the process of investing the requisite amount of capital. Therefore, the petitioner could either pay all $500,000 now or pay it over time. The regulations do not require that a petitioner pay extra to compensate for the fact that money paid now is worth more than money paid later, he argues. The petitioner points out that, at the time an alien investor seeks to remove the conditions of his permanent resident status, he need only demonstrate that he has "substantially" complied with the investment requirement. The petitioner main-

---

[24]It should be noted that the bank balances are for completely different dates, and it is not known if money was transferred among the various accounts and some of the funds double-counted. The petitioner did not provide transactions histories, and only one bank statement specifies the date on which the account was opened.

tains that by delivering the executed promissory note for the full $500,000, he has already made the full investment, and the schedule of payments is irrelevant.

The petitioner has failed to demonstrate that his promissory note, if it is to be considered capital, has a fair market value equal to its face value of $500,000. The question to be asked is what a third party would pay for the petitioner's note. In the real business world, promissory notes, such as mortgages, are regularly sold and are regularly discounted; present value is always relevant. The petitioner has submitted no evidence whatsoever as to the fair market value of his promise to finish paying $500,000 over six years.[25] In fact, applying standard formulae for computing the fair market value of annuities and future payments, the present value of five annual payments of $18,000 plus a payment due in six years of $290,000 plus a completed payment of $120,000 would be approximately $375,000 instead of $500,000.[26]

Under certain circumstances, a promissory note that does not itself constitute capital could instead constitute evidence that the petitioner is "in the process of investing" other capital, such as cash. In that situation, 8 C.F.R. § 216.6(c)(1)(ii) requires that a petitioner substantially complete his payments on the note prior to the end of the two-year conditional period. In the present case, however, the promissory note is not evidence that the petitioner is in the process of investing $500,000 of cash. As discussed earlier, the five $18,000 annual payments are covered by the guaranteed annual distributions. The $290,000 balloon payment is not due until well after the two-year period.

In administering this program, the Service has a responsibility to ensure that the requisite amount of money is actually paid by the petitioners. Over the years, the Service has observed that the terms of promissory notes have grown progressively longer; AELP, for example, started with due dates of four and five years, while the petitioner's payment plan, a more recent AELP development, involves six years. The schedule of payments under a promissory note, whether the note is used as capital or as evidence of a

---

[25]As noted earlier, it is not actually clear that the petitioner is in fact obligated to complete all of his payments prior to exercising his sell option. If the petitioner can avoid making the last payment of $290,000 by simply exercising his sell option at the time the payment is due, any purchaser of the note could not count on receiving this last payment and would further discount the value of the note. In addition, as discussed earlier, section 2.C of the investment agreement provides that the petitioner is not obligated to make any further payments on the note in the event of the Partnership's bankruptcy (voluntary or involuntary) or failure to make any of its own payments; this further reduces the value of the promissory note to a third-party purchaser.

[26]As discussed above, the note in this case would be further discounted for other reasons, such as the lack of adequate security.

commitment to invest, is relevant to the issue of whether a petitioner has, in good faith, committed the requisite amount of his personal funds. It is also relevant to the issue of the amount of funds at risk and available to the job-creating enterprise(s). Therefore, at a minimum, nearly all of the money due under a promissory note must be payable within two years, without provisions for extensions.[27] To allow otherwise would permit the admission of aliens who, by the terms of their investment plans, would be ineligible for removal of the conditions of their permanent resident status. *See* 8 C.F.R. § 216.6(c)(1)(iii).

If the instant petition were to be approved, the petitioner would have paid at most $123,600 of his own funds at the time he sought removal of the conditions of his permanent resident status.[28] This is far short of the requisite $500,000 and hardly evidences a good-faith commitment of funds. As noted above, the petitioner has also failed to show that the promissory note is adequately secured and that it otherwise has an adequate fair market value.

### Source of funds

8 C.F.R. § 204.6(j) states, in pertinent part, that:

(3) To show that the petitioner has invested, or is actively in the process of investing, capital obtained through lawful means, the petition must be accompanied, as applicable, by:

(i) Foreign business registration records;

(ii) Corporate, partnership (or any other entity in any form which has filed in any country or subdivision thereof any return described in this subpart), and personal tax returns including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind filed within five years, with any taxing jurisdiction in or outside the United States by or on behalf of the petitioner;

(iii) Evidence identifying any other source(s) of capital; or

(iv) Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments against the petitioner from any court in or outside the United States within the past fifteen years.

---

[27]The petitioner must still show that the promissory note is adequately secured and that the promissory note has an adequate fair market value.

[28]§§ 216A(c)(1) and (d)(2) of the Act provide that such a petition must be filed within the 90-day period preceding the second anniversary of a petitioner's admission as a conditional permanent resident.

While the record contains a letter from Wells Fargo Bank dated October 14, 1997, acknowledging the receipt of $120,000 and advising the petitioner that the funds had been deposited into a custody account, the record does not reveal from where these funds originated. It is not known if the money came from the petitioner's overseas accounts, from his U.S. accounts, or from some other source. As the petitioner has not documented the path of the funds, such as by wire-transfer records, the petitioner has failed to meet his burden of establishing that the initial $120,000 were his own funds. *See Matter of Soffici*, 22 I&N Dec. 158 (Comm. 1998).

The petitioner has also failed to document the source of the hundreds of thousands of dollars in his bank accounts. The petitioner is 30 years old and, according to counsel, began his "entrepreneurial activities" in May 1993. The petitioner is said to be the president of a company that imports and sells vintage Levis jeans in Japan.

The only evidence of earnings contained in the record consists of two documents from the Director of Nerima Higasi Taxation Office. These documents indicate that, for the taxable year of June 3, 1996, to May 31, 1997, South Bay Trading Japan, Inc., declared Y12,674,887 in corporate income and paid Y3,992,100 in taxes. Counsel states that, applying an exchange rate of 122 Japanese yen to one U.S. dollar, the company's taxable income was $103,892.52 for this period. After subtracting taxes paid, however, the net income of South Bay Trading was approximately $71,170.

Furthermore, this figure says nothing about the *petitioner's* level of income that year, and the petitioner has not submitted any documentation about his level of income during other years. Assuming that the petitioner had taken all of South Bay's net income for himself, and assuming that the petitioner's business activities had been just as successful in the previous three years, and assuming that the petitioner had had no living expenses, he could have saved no more than $300,000; counsel claims that the petitioner's bank accounts contain over $650,000. Therefore, the petitioner has failed to meet the requirements of 8 C.F.R. § 204.6(j)(3).

### Estoppel and reliance considerations

In his brief on behalf of the petitioner, counsel refers to instances in which he was supposedly guaranteed that his clients' petitions would be approved. Counsel states that in 1992 he was given a model petition and advised that if he patterned his investment structures in the same way, his clients' petitions would be approved.

In the fall of 1996, counsel met with "the Senior INS representative in charge of immigrant investor programs" and this person

> expressly approved the $120,000 initial payment option, the six year schedule of payments in the sell-option or redemption agreement available after all of the payments

> have been made. The only limitation placed upon any of these provisions was that the redemption agreement could not be exercised until all of the payments had been made by the investor.

Brief at 46. Counsel states, at page 14, "Thereafter, INS kept its word. Approximately 95 petitions of AELP were approved by INS including over 50 petitions involving the initial payment option of $120,000." The opinions of a single Service official, however, are not binding, and as stated earlier, no Service officer has the authority to pre-adjudicate an immigrant-investor petition.

Counsel states that he has submitted 11 different partnership plans to the Service and that they are all identical; since the first petitions were approved, the Service is bound to approve the petition at issue here. Counsel further claims that on more than 30 occasions, he had been promised that no "changes" would be made except by formal rulemaking. Counsel is saying, in effect, that the approval of his programs is nonreviewable except upon a writing of formal regulations. Opinions purportedly expressed by a few Service officials cannot remove the AAU's regulatory authority to review these cases. To say that an agency's knowledge cannot grow, and that an agency is prohibited from benefiting from its experience, is unreasonable.

The petitioner argues that the OGC opinion of December 19, 1997, constitutes a rule change that the Service is now retroactively applying in violation of the Administrative Procedure Act ("APA"). Brief at 4-7, 114-43; Second Supplemental Brief at 5-12. This OGC opinion, however, is not a "rule." Under the APA, a rule is a binding legal principle "designed to implement, interpret or prescribe law or policy." 5 U.S.C. § 551. As noted in the OGC opinion itself, the opinion in no way modifies existing law, but is intended merely to provide guidance to the Service in understanding many factual issues that have arisen over the years with respect to immigrant-investor petitions. Providing this type of guidance is the very mission of OGC, as specifically provided at 8 C.F.R. § 100.2(a)(1) and 103.1(b)(1). These regulations do not delegate any authority to OGC to establish binding legal principles or to exercise any other rulemaking power. Neither the AAU nor other Service adjudicators, therefore, are bound to follow the OGC opinion of December 19, 1997. The AAU's decision in this case is based entirely on the application of longstanding statutory and regulatory law to the facts presented in this petition.

The petitioner incorrectly argues that the Service should be estopped from finding that his investment plan is inconsistent with § 203(b)(5) of the Act and the relevant regulations. The Supreme Court has never upheld a claim that a Government agency may be estopped from deciding a case before it, such as this case, in accordance with the law. *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 422 (1990).

Furthermore, even if estoppel were applicable to the Service under these circumstances, the petitioner has completely failed to establish the requisite elements therefor. For example, the petitioner has shown no affirmative misconduct on the part of the Service.

Moreover, the petitioner has not shown that he has detrimentally relied on any prior representation by a Service official. First, no basis exists for a claim that the petitioner or his counsel "reasonably" or "justifiably" believed that informal discussions between counsel and any Service officer were an acceptable substitute for following the normal rules applicable to the filing and adjudication of investor-visa petitions. It is basic immigration law that the only way to obtain a determination on eligibility for immigrant-investor classification is to file a petition with the Service. *See* section 204(a)(1)(F); 8 C.F.R. § 2.1 and 204.6(a), Furthermore, the Service may approve a petition only if the Service makes a formal adjudication "[a]fter an investigation of the facts in each case," that the alien is eligible for the classification sought, § 204(b) of the Act.

In addition, even if the petitioner were able to establish reasonable reliance, he has not shown that he has done so to his detriment. For example, according to the investment plan, the petitioner is only obligated to pay the required investment upon the approval of his visa petition. Brief at 29.

## THE PETITIONER HAS NOT ESTABLISHED A NEW COMMERCIAL ENTERPRISE

8 C.F.R. § 204.6(h) states that the establishment of a new commercial enterprise may consist of:

(1) The creation of an original business;

(2) The purchase of an existing business and simultaneous or subsequent restructuring or reorganization such that a new commercial enterprise results; or

(3) The expansion of an existing business through the investment of the required amount, so that a substantial change in the net worth or number of employees results from the investment of capital. Substantial change means a 40 percent increase either in the net worth, or in the number of employees, so that the new net worth, or number of employees amounts to at least 140 percent of the pre-expansion net worth or number of employees. Establishment of a new commercial enterprise in this manner does not exempt the petitioner from the requirements of 8 C.F.R. § 204.6(j)(2) and (3) relating to the required amount of capital investment and the creation of full-time employment for ten qualifying employees. In the case of a capital investment in a troubled business, employment creation may meet the criteria set forth in 8 C.F.R. § 204.6(j)(4)(ii).

8 C.F.R. § 204.6(e) states that:

*Troubled business* means a business that has been in existence for at least two years,

197

has incurred a net loss for accounting purposes (determined on the basis of generally accepted accounting principles) during the twelve- or twenty-four month period prior to the priority date on the alien entrepreneur's Form I-526, and the loss for such period is at least equal to twenty percent of the troubled business's net worth prior to such loss. For purposes of determining whether or not the troubled business has been in existence for two years, successors in interest to the troubled business will be deemed to have been in existence for the same period of time as the business they succeeded.

According to the plain language of § 203(b)(5)(A)(i) of the Act, a petitioner must show that he is seeking to enter the U.S. for the purpose of engaging in a new commercial enterprise that **he** has established. As counsel maintains, the new commercial enterprise at issue here is AELP. AELP, however, was established on March 25, 1996. The petitioner executed the various partnership documents on October 14, 1997. The petitioner did not indicate, at Part 4 of the Form I-526, in what way he was creating a new enterprise.

While AELP is a new commercial enterprise, in that it was formed after November 29, 1990, the petitioner had no hand in its creation and was not present at its inception.[29] Therefore, the petitioner must demonstrate that he will restructure or reorganize AELP to the degree that a new business will result, or he must demonstrate that he will expand AELP's net worth or number of employees by 40 percent, or he must demonstrate that AELP is a troubled business as defined above.

AELP was an ongoing business prior to the petitioner executing the investment agreement, and it intends to continue in its current form; therefore, the petitioner has not established the requisite restructuring or reorganization. As the petitioner has noted on numerous occasions, 95 investors have previously been approved with respect to AELP. Taking his claims at face value, and assuming that all 95 investors have made capital investments of $500,000, it is not possible for this petitioner to expand AELP by 40 percent with a single "investment" of $500,000. Finally, the petitioner has not submitted evidence to show that AELP has suffered the degree of loss in net worth specified by 8 C.F.R. § 204.6(e) to qualify as a troubled business; in addition, AELP was not in existence for at least two years prior to the time the petitioner signed the investment agreement.

The AAU recognizes that the Service has previously approved petitions involving plans in which limited partners joined partnerships over varying periods of time. Experience has shown, however, that some of these pool-

---

[29]It could perhaps be argued that the date of filing of the Certificate of Limited Partnership was not the date of AELP's creation, that AELP is still in the process of being created, and that therefore the petitioner is part of the original creation of AELP. If so, the petition has been filed prematurely; the Act requires that the petitioner "has established" the commercial enterprise already. Accomplishment of a business's purposes would be too speculative if it was based on successfully attracting unidentified future investors.

ing arrangements are being used to circumvent the establishment requirement set forth by Congress.

The petitioner has failed to show that **he** has established a new commercial enterprise, as required by § 203(b)(5)(A)(i) of the Act.

### THE PLAN DOES NOT MEET THE
### EMPLOYMENT-CREATION REQUIREMENT

8 C.F.R. § 204.6(j)(4)(i) states:

> To show that a new commercial enterprise will create not fewer than ten (10) full-time positions for qualifying employees, the petition must be accompanied by:

> (A) Documentation consisting of photocopies of relevant tax records, Form I-9, or other similar documents for ten (10) qualifying employees, if such employees have already been hired following the establishment of the new commercial enterprise; or

> (B) A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired.

8 C.F.R. § 204.6(g) deals with multiple investors and states, in pertinent part:

> (1) The establishment of a new commercial enterprise may be used as the basis of a petition for classification as an alien entrepreneur by more than one investor, provided each petitioning investor has invested or is actively in the process of investing the required amount for the area in which the new commercial enterprise is principally doing business, and provided each individual investment results in the creation of at least ten full-time employees.

> (2) The total number of full-time positions created for qualifying employees shall be allocated solely to those alien entrepreneurs who have used the establishment of the new commercial enterprise as the basis of a petition on Form I-526. No allocation need be made among persons not seeking classification under section 203(b)(5) of the Act or among non-natural persons, either foreign or domestic. The Service shall recognize any reasonable agreement made among the alien entrepreneurs in regard to the identification and allocation of such qualifying positions.

As discussed earlier, the petitioner has failed to demonstrate that the subsidiary credit corporation has extended loans in the past to export-related businesses located within the geographical limitation of the regional center. Similarly, the credit corporation's loan prospects do not appear to involve businesses within the geographical limitation. No reason exists to believe that this petitioner's money will be lent to businesses within the geographical area. Therefore, he must establish direct employment creation.

The petitioner has failed to show that AELP has hired or will hire a sufficient number of employees to allocate 10 full-time positions to each of the 95 previously-approved petitioners as well as to this petitioner and the remaining 64 petitioners whose cases have not been decided.

## CONCLUSION

In his brief, counsel states, "INS is supposed to *grant* immigrant investor petitions, not to *deny* them. INS is to interpret the laws and regulations liberally and generously so as to achieve [this] Congressional purpose." He presents statistics showing that, of the total number of visas made available, only six percent has been used. The fact that counsel considers this category to be under-utilized is irrelevant. The alien-entrepreneur classification is for a special kind of person, and it is not surprising that, notwithstanding the random number fixed by Congress, few people have both the financial means and the entrepreneurial spirit to apply. The Service will not eviscerate the meaning of the regulations or the essence of the law simply to "fill up" the numbers. The measure of success or failure of the EB-5 program is not the number of petitions granted; rather, it is the extent to which proper compliance is achieved and genuine investments are made.

Counsel continues, "Failing to comply reflects adversely upon INS as having failed to properly communicate to those attempting to comply, that which is necessary to comply." The foregoing decision should offer some guidance as to what is necessary to comply.

The burden of proof in these proceedings rests solely with the petitioner. Section 291 of the Act, 8 U.S.C. § 1361. The petitioner has not met that burden. Accordingly, the petition is denied.

**ORDER:** The decision of the director is affirmed. The petition is denied.