# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 4, 2020        Decided August 21, 2020

No. 19-5025

MIRROR LAKE VILLAGE, LLC, ET AL.,
APPELLANTS

v.

CHAD F. WOLF, ACTING SECRETARY, U.S. DEPARTMENT OF
HOMELAND SECURITY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01955)

*H. Ronald Klasko* argued the cause and filed the briefs for appellants.

*Joshua S. Press*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Glenn M. Girdharry*, Assistant Director.

Before: HENDERSON and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.[*]

Opinion for the Court filed by *Circuit Judge* GARLAND.

Concurring opinion filed by *Circuit Judge* HENDERSON.

GARLAND, *Circuit Judge*: The EB-5 program allots visas to immigrants who have "invested . . . capital" in a new commercial enterprise that will "benefit the United States economy" and "create full-time employment" for ten citizens or non-citizens with work authorization. 8 U.S.C. § 1153(b)(5)(A)(i)-(ii). The plaintiffs in this case are Mirror Lake Village, LLC, a new commercial enterprise set to construct and operate a senior living facility in rural Washington, and five foreign nationals who each contributed $500,000 to Mirror Lake. The foreign nationals sought to obtain lawful permanent resident status under the EB-5 immigrant-investor program. The U.S. Citizenship and Immigration Services (USCIS) denied their EB-5 visa petitions on the stated ground that none had made a qualifying investment. The plaintiffs contend that the denials were arbitrary and capricious. Because USCIS failed to offer a reasoned explanation for its denials, we agree.

---

[*] The late Senior Circuit Judge Stephen F. Williams was a member of the panel at the time the case was argued and participated in its consideration before his death on August 7, 2020. Because he died before this opinion's issuance, his vote was not counted. *See Yovino v. Rizo*, 139 S. Ct. 706, 710 (2019). Judges Henderson and Garland have acted as a quorum with respect to this opinion and judgment. *See* 28 U.S.C. § 46(d).
.

I

The EB-5 program, so-named because it is the fifth employment-based visa category available to foreign nationals, is part of the Immigration and Nationality Act. *See* 8 U.S.C. §§ 1101 *et seq.*; *id.* § 1153(b)(5). As quoted above, it allots visas to immigrants who have "invested . . . capital" in a new commercial enterprise that "will benefit the United States economy and create full-time employment" for ten citizens or non-citizens with work authorization. *Id.* § 1153(b)(5)(A)(i)-(ii). At the relevant time here, an immigrant investing in an enterprise located in a rural area had to contribute at least $500,000 to qualify. *Id.* § 1153(b)(5)(B)(ii); *EB-5 Immigrant Investor Program Modernization*, 84 Fed. Reg. 35,750, 35,806 n.149 (July 24, 2019).

Although the statute does not define the term "invest," the Department of Homeland Security (DHS) has defined it by regulation as "to contribute capital." 8 C.F.R. § 204.6(e). According to DHS, a "note, bond, convertible debt, obligation, or any other debt arrangement . . . does not constitute a contribution of capital." *Id.* In order to distinguish between a qualifying capital contribution and a prohibited debt arrangement, USCIS determines whether an immigrant-investor has "placed the required amount of capital *at risk.*" *Id.* § 204.6(j)(2) (emphasis added); *see also* 84 Fed. Reg. at 35,756 (providing that an EB-5 petition "must be supported by evidence that the foreign national's lawfully obtained capital is invested (i.e., placed at risk)").

The road to lawful permanent resident status under the EB-5 program is as follows. An immigrant first files an EB-5 visa petition. Once the petition is processed and a visa becomes available -- which may take years -- the immigrant advances to "conditional" lawful permanent resident status. 8 U.S.C.

§ 1186b(a). Eventually, the immigrant may file a petition to have the "conditional" basis of his or her lawful permanent resident status removed. That petition must be accompanied by evidence that the immigrant has "maintained his or her capital investment" for over two years and "created or can be expected to create within a reasonable time ten full-time jobs for qualifying employees." 8 C.F.R. § 216.6(a)(4)(iii)-(iv). The immigrant then undergoes another processing period of uncertain length. Only after the second petition is approved does an EB-5 immigrant graduate to full lawful permanent resident status.

The five foreign nationals here each contributed $500,000 to Mirror Lake Village, LLC, in exchange for membership interests in the company. Because Mirror Lake is a closely held corporate entity, the plaintiffs were warned beforehand that "[t]here [would be] no secondary market" for their membership interests and that it was "not expected that any w[ould] develop." Offering Memorandum at 4 (J.A. 22). But the Mirror Lake Operating Agreement does provide the plaintiffs with two opportunities to sell their ownership shares.

First, each plaintiff has a "one-time right and option" to sell all or part of the plaintiff's membership interest back to Mirror Lake "at the purchase price thereof" once the conditional basis of the plaintiff's lawful permanent resident status is removed. Operating Agreement at 8 (J.A. 8); *see id.* at 1 (J.A. 1). Second, beginning two years after that, each plaintiff can sell 20% of the plaintiff's interest to Mirror Lake each year "at a price equal to the Fair Market Value thereof," such that a full interest can be sold back to the company over five years. *Id.* at 9 (J.A. 9).[1]

---

[1] The Operating Agreement defines "Fair Market Value" with respect to a membership interest as "the price a knowledgeable, willing, and unpressured buyer would probably

Critically for our purposes, the ability of a plaintiff to exercise either of these sell-back options is contingent on Mirror Lake having "sufficient Available Cash Flow" at the time the option is triggered. *See id.* at 8, 9 (J.A. 8, 9). "Available Cash Flow," according to the Operating Agreement, equals the "total cash available to the Company from all sources less the Company's total cash uses before payment of debt service." *Id.* at 1 (J.A. 1). The sell-back options are further subject to Mirror Lake having sufficient available cash flow "excluding capital contributed by Members." *Id.* at 8, 9 (J.A. 8, 9).

The plaintiffs filed identical EB-5 visa petitions with USCIS, providing evidence of their capital contributions to Mirror Lake. USCIS denied each, finding that the plaintiffs "fail[ed] to establish that [they] ha[d] placed the required minimum amount of capital at risk." Visa Denial at 5 (J.A. 65); *see* 8 C.F.R. § 204.6(j)(2).

The denials hinged on the presence of the sell-back options in the Mirror Lake Operating Agreement. Visa Denial at 5-6 (J.A. 65-66). In USCIS's view, the "Operating Agreement . . . stated explicitly . . . that [each] investor's capital will be returned upon demand at the end of the petitioner's conditional residency." *Id.* at 6 (J.A. 66). USCIS acknowledged that the sell-back options are "expressly contingent" on Mirror Lake's available cash flow and hence on its "future financial performance." *Id.* Nevertheless, the agency said, if Mirror Lake is "profitable" and has "sufficient cash flow," the plaintiffs can redeem their membership interests. *Id.* Therefore, it concluded, the plaintiffs' capital "is not properly . . . 'at risk.'" *Id.*

---

pay to a knowledgeable, willing, and unpressured seller in the market . . . as determined by an independent third-party valuation service or as otherwise agreed by relevant parties." Operating Agreement at 2 (J.A. 2).

The plaintiffs filed motions requesting that USCIS reopen and reconsider the denials of their EB-5 petitions. USCIS denied those motions, too, finding that the plaintiffs had "still not demonstrated that the required minimum amount of capital was placed at risk." Denial of Mot. at 5 (J.A. 87). Again, USCIS rejected the contention that the plaintiffs faced a risk of loss because exercise of the sell-back options turned on available cash flow. "This argument neglects to contemplate [Mirror Lake's] potential success," USCIS said. *Id.*

Having exhausted their opportunities for recourse at USCIS, the five plaintiffs, along with Mirror Lake, filed an Administrative Procedure Act challenge in the district court. *See* 5 U.S.C. § 702.[2] Together, they argued that USCIS's denials of the plaintiffs' EB-5 visa petitions were arbitrary and capricious or otherwise in excess of statutory authority. Disagreeing, the district court granted summary judgment to USCIS. *Mirror Lake Village v. Nielsen*, 345 F. Supp. 3d 56, 64-68 (D.D.C. 2018).

II

We must hold unlawful agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's actions are arbitrary and capricious if they are not "reasonably explained." *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015).

---

[2] In the district court, the plaintiffs were joined by a sixth EB-5 visa petitioner, Zhichun Li, who had not exhausted administrative procedures before USCIS. The district court dismissed Zhichun Li's complaint. *Mirror Lake Village, LLC v. Nielsen*, No. 16-cv-01955 (D.D.C. Feb. 6, 2019).

1.  In this case, USCIS did not reasonably explain its denials of the plaintiffs' visa petitions.  In both its initial denials and in rejecting the plaintiffs' motions for reconsideration, USCIS offered a clear definition of "capital at risk":  "For the capital to be 'at risk,'" the agency said, "there must be a risk of loss and a chance for gain."  Visa Denial at 4 (J.A. 64); Denial of Mot. at 4 (J.A. 86).  But as the plaintiffs point out, their investments fit that description.  Because the sell-back options in the Operating Agreement are contingent on Mirror Lake's available cash flow, any return on capital is "entirely subject to business fortunes."  Mirror Lake Br. 3.  If Mirror Lake is unsuccessful -- or even just short on cash -- the plaintiffs will be unable to recoup their investments.  Only if Mirror Lake is successful will they have an opportunity for gain.

The agency's only response to this point was to say:  "[T]he petitioner is arguing that her capital is at risk only insofar as the [business] is not profitable.  Should the [business] be profitable and have sufficient cash flow, the [sell-back] Option was clearly written as an exit strategy."  Visa Denial at 6 (J.A. 66).  Elaborating on this explanation for why the capital was not "at risk," the agency's denial of rehearing stated:  "[The petitioner's] argument neglects to contemplate the [business'] potential success."  Denial of Mot. at 5 (J.A. 87).

This "explanation" is no explanation at all.  The possibility that the business will succeed does not negate the risk of loss if it does not.  If it did, even the purest stock investment would not be at risk because there is always the possibility (and the hope) that a business will succeed.  In fact, as quoted above, the agency's explanation directly contradicted its own definition of "at risk," as set out earlier in each USCIS decision under review.  In each, the agency explained that "for capital to be at risk there must be a risk of loss and a chance for gain."  Visa Denial at 4 (J.A. 64); Denial of Mot. at 4 (J.A. 86).  Here, there is a risk of

loss if there is insufficient cash flow, and a chance for gain (the option is, after all, optional) if the business prospers.

On appeal, the government does not even attempt to rescue this explanation of why the petitioner's capital is not at risk. Indeed, its appellate brief does not even mention the cash-flow contingency to the sell-back options. Hence, it offers no explanation of why that contingency failed to put the plaintiffs' investments "at risk," as required by the regulation. *See* 8 C.F.R. § 204.6(j)(2).

2. Instead, USCIS turns for support to an agency precedent. But that precedent likewise provides no support for the visa denials.

USCIS focuses its briefing and argument on *Matter of Izummi*, 22 I. & N. Dec. 169 (Assoc. Comm. 1998), which the agency cited in its denials, and which also involved a rejected EB-5 visa petitioner. There, the petitioner also had the opportunity to sell his membership interest back to the business in which he had invested. Yet, unlike in this case, there was no contingency in *Izummi*. Instead, the petitioner's capital was "guaranteed to be returned, regardless of the success or failure of the business." *Id.* at 184. For that reason, the agency said, the capital "cannot be considered to have been properly 'invested' and is not at risk." *Id.* at 188.

USCIS's visa denial cites to isolated sentences in *Izummi* that it reads to mean that any "redemption agreement" constitutes a prohibited "debt arrangement." Visa Denial at 6 (J.A. 66). But in context, it is plain that what *Izummi* meant by "redemption agreement" was the kind of agreement at issue in that case: one that guaranteed a return of capital, without risk. *See Izummi*, 22 I. & N. Dec. at 185 (finding that the redemption agreement there was no more than a "straight loan" because the

petitioner had made his money "available to [the business] with the contractual expectation that it would be returned to him six months later"). Indeed, the business in *Izummi* was required to "deposit sufficient [cash] reserves for the purpose of enabling [it] to meet its obligations under the sell-option agreement." *Id.* at 191 (internal quotation marks omitted).

In denying the plaintiffs' motion to reopen or reconsider here, USCIS also cited *Izummi* for the proposition that a sell-back option contingent on business success constitutes an "illusory promise[]" that the agency will not accept. Denial of Mot. at 5 (J.A. 87) (internal quotation marks omitted). On appeal, USCIS does not attempt to defend that argument either, and for good reason: it is a misreading of *Izummi*. *Izummi* discussed "illusory promises" in the context of responding to an attorney's claim that the investment there was at risk, not because its redemption was dependent on business success, but because the business might simply refuse to repay the petitioner as the contract required. "While most normal investors . . . realize that they risk losses due to business downturns," *Izummi* explained, "the[] attorney believes that their risk instead involves the refusal of the[] [business] to comply with the written contract." *Izummi*, 22 I. & N. at 185.

*Izummi* refused to accept the risk of an "illusory promise" -- i.e., a sell-back agreement that a business simply refused to honor -- as "the kind of risk contemplated by 8 C.F.R. § 204.6(j)(2)." *Id*. The investment risk at issue here is not of that illusory type. It is the risk of loss if a business does not succeed, not the risk that the business will simply renege on its contract.

In sum, the plaintiffs put their capital at risk because the redemption of their investments is dependent on the success of the business. USCIS's decision to deny the visas on the

purported ground that the investments are not at risk at all is neither reasonably explained nor supported by agency precedent. It is therefore arbitrary and capricious and must be set aside. *Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1141 (D.C. Cir. 2014).

## III

For the foregoing reasons, we reverse the judgment of the district court and remand with instructions to set aside the denials of the plaintiffs' EB-5 petitions.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring: Although I join the court's opinion, I write separately to urge caution. The EB-5 program is well known for its susceptibility to fraud and abuse. *See, e.g.*, Audrey Singer and Camille Galdes, *Improving the EB-5 Investor Visa Program: International Financing for U.S. Regional Economic Development*, Brookings-Rockefeller Project on State and Metropolitan Innovation, 3, 11 (Feb. 2014), https://www.brookings.edu/wp-content/uploads/2016/06/EB5_Report.pdf (noting the EB-5 program's "negative reputation," that it "faced widespread fraud and abuse in its first few years of operation" and "[m]ore recently, several high-profile cases have brought unfavorable attention to the program"). Given this vulnerability, I believe we should hesitate to undo USCIS's efforts designed to ensure the integrity and further the purpose of the program—i.e., to "benefit the United States economy and create full-time employment." 8 U.S.C. § 1153(b)(5)(A)(ii). This includes its effort to ensure that the funds invested in domestic businesses in exchange for permanent residency remain there.

I agree that the USCIS failed to explain adequately its denial of the plaintiffs' visa petitions but I believe the question whether the investment was sufficiently "at risk," *see* 8 C.F.R. § 204.6(j)(2), is close. If the only risk an investor must show is that the business may not succeed or not be profitable enough, that interpretation could undermine the purpose of the program. The line between a business failing and a business not being as successful or profitable as investors anticipated is thin. Indeed, that risk is faced by any business investor. *See Matter of Izummi*, 22 I. & N. Dec. 169, 185 (Assoc. Comm. 1998) ("The risk that the petitioner might not receive payment if the Partnership fails is no different from the risk any business creditor incurs."). But the EB-5's goal of "benefit [to] the United States economy," § 1153(b)(5)(A)(ii), contemplates that the required investment in the business remain there, including after a visa is obtained. Granted, the plaintiffs here

can exercise their put option only if Mirror Lake is profitable enough that it has sufficient cash flow without regard to the investment made pursuant to the EB-5 program. Operating Agreement at 8 (J.A. 8) (put option "subject to the Company having sufficient Available Cash Flow (excluding capital contributed by Members)"). Nevertheless, to ensure that a sufficient risk exists that does not simultaneously defeat the purpose of the EB-5 program, the risk threshold—i.e., the requisite success of the business—should plainly be something more demanding than simply not going bankrupt.