# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 7, 2025            Decided February 13, 2026

No. 24-5237

EB5 HOLDINGS INC., ET AL.,
APPELLANTS

v.

JOSEPH EDLOW, DIRECTOR, UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-01180)

---

*Brad Banias* argued the cause and filed the briefs for appellants.

*Alexandra McTague*, Senior Litigation Counsel, U.S. Department of Justice, argued the cause for appellee. On the brief were *Yaakov M. Roth*, Acting Assistant Attorney General, *Glenn M. Girdharry*, Assistant Director, and *Alessandra Faso*, Senior Litigation Counsel.

Before: HENDERSON and RAO, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: For more than thirty years, federal law has set aside permanent resident visas for immigrants who invest capital into "regional centers" that promote economic growth by creating jobs and spurring investment. In 2022, the Congress overhauled this program in response to widespread reports of abuse. As part of this reform, the Congress mandated that, moving forward, regional centers participating in the program must contribute an annual fee for the monitoring and reporting of fraud. The question in this appeal is whether the 600-plus regional centers that have been active since before 2022 are exempt from paying this fee. The district court concluded that they are not and we agree. We therefore affirm.

## I. BACKGROUND

In 1990, the Congress established the EB-5 program—an employment-based, fifth preference (hence the name) "visa program for noncitizens who invest in a job-creating enterprise." *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 334 (D.C. Cir. 2023) (citing Immigration Act of 1990, Pub. L. No. 101-649, § 121(b)(5), 104 Stat. 4978, 4989 (codified at 8 U.S.C. § 1153(b)(5))). Since its inception, the EB-5 program has allotted visas to immigrants who have invested, or are in the process of investing, capital in a "new commercial enterprise" that will create full-time employment for at least 10 U.S. citizens or qualifying non-citizens. 8 U.S.C. § 1153(b)(5)(A).

Two years after rolling out the EB-5 program, the Congress established, in an appropriations rider, what is now called the regional center program. Departments of

Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, Pub. L. No. 102-395, § 610(a), 106 Stat. 1828, 1874 (1992) (Appropriations Act of 1992). Originally a pilot program, the regional center program offered an additional pathway to obtain an EB-5 visa by setting aside visas for EB-5 applicants who pooled together sufficient capital to invest in "a regional center" for "the promotion of economic growth." *Id.* § 610(a), 106 Stat. at 1874. The main draw of the program was that it relaxed the 10-person job-creation requirement to secure an EB-5 visa. Immigrant Investor Pilot Program, 58 Fed. Reg. 44,606, 44,606 (Aug. 24, 1993) (to be codified at 8 C.F.R. pts. 103, 204). Immigrants who wished to invest in a regional center could satisfy the 10-person benchmark "not only by tallying all jobs directly created by their enterprise but also based on economic projections of direct and indirect job creation." *Aiteliyev v. Mayorkas*, 717 F. Supp. 3d 67, 70 (D.D.C. 2024); *accord* Appropriations Act of 1992, § 610(c), 106 Stat. at 1874.

The appropriations rider authorizing the regional center program did not define "regional center" or "designate a particular regional center" to participate in the program. Immigrant Investor Pilot Program, 58 Fed. Reg. at 44,607. To fill in that gap, the Immigration and Naturalization Service (Service) promulgated an interim rule the following year. *Id.* at 44,606–10. The rule defined a "regional center" as any public or private economic unit "involved with the promotion of economic growth," *id.* 58 Fed. Reg. at 44,608, and announced that the agency "w[ould] begin accepting proposals from regional centers for participation in the" pilot program, *id.* at 44,607. "Each regional center wishing to participate," the rule stated, was required to submit a proposal that "[c]learly describe[d]" how the regional center would "promote economic growth through increased export sales, improved

regional productivity, job creation, and increased domestic capital investment." *Id.* at 44,609.

Although it was meant to last only five years, the Congress repeatedly extended the regional center program over the course of three decades, making it "a 'pilot' in name only." *Behring Reg'l Ctr. LLC v. Mayorkas*, No. 22-cv-02487, 2022 WL 2290594, at *2 (N.D. Cal. June 24, 2022). By 2021, "over ninety percent of EB-5 applicants invested in the United States through a regional center," *Del. Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*, 106 F.4th 1195, 1198 (D.C. Cir. 2024) (citation omitted), and the Service—succeeded by the U.S. Citizenship and Immigration Services (USCIS)—had designated over 600 regional centers to take part in the program, *Behring Reg'l Ctr.*, 2022 WL 2290594, at *2.

In time, however, the regional center program acquired a poor reputation for "its susceptibility to fraud and abuse." *Mirror Lake Vill., LLC v. Wolf*, 971 F.3d 373, 378 (D.C. Cir. 2020) (Henderson, J., concurring). As more immigrants sought to invest capital in regional centers, the USCIS had difficulty confirming whether the funds were coming from legal sources. *Behring Reg'l Ctr.*, 2022 WL 2290594, at *2. The program also faced criticism for its "appearance of favoritism and special access" and concerns "mounted that regional centers might be taking advantage of foreign investors," *id.* (quotation omitted), as several high-profile cases revealed that bad actors had set up centers to lure EB-5 applicants, Audrey Singer & Camille Galdes, Brookings Inst., *Improving the EB-5 Investor Visa Program: International Financing for U.S. Regional Economic Development* 2 (2014).

In 2022, the Congress reacted with the EB-5 Reform and Integrity Act (RIA or Act). Pub. L. No. 117-103, div. BB, 136 Stat. 1070. Of relevance here, the RIA repealed the

appropriations rider creating the pilot regional center program and "reauthoriz[ed]" the program, § 103, 136 Stat. at 1075 (boldface deleted), with a "series of reforms designed to strengthen oversight and combat fraud," *Behring Reg'l Ctr.*, 2022 WL 2290594, at *2. Pursuant to the RIA, the statutory authority for the new-and-improved regional center program is now section 203(b)(5)(E) of the Immigration and Nationality Act (subparagraph (E))—titled simply, the "Regional center program." § 103(b)(1), 136 Stat. at 1075 (codified at 8 U.S.C. § 1153(b)(5)(E)).

Subparagraph (E) begins, in clause (i), with a general restatement of how the program works. "In general," it states, "[v]isas under this subparagraph shall be made available through September 30, 2027, to qualified immigrants . . . pooling their investments . . . in a program . . . that involves a regional center in the United States, which has been designated by the Secretary of Homeland Security on the basis of a proposal for the promotion of economic growth." *Id.* § 1153(b)(5)(E)(i) (boldface deleted). Clause (E)(iii) sets out the requirements for the "[e]stablishment of a regional center" under the reformed program. *Id.* § 1153(b)(5)(E)(iii) (boldface deleted). As was the case under the pilot program, each regional center hopeful must submit a "proposal" that demonstrates how its "pooled investment will have a substantive economic impact" on the geographical area where the center will be located. *Id.* But unlike before, each regional center applicant must include information in its proposal that will help prevent fraud. *See id.* § 1153(b)(5)(E)(iii)(II)–(V). For example, a proposal must describe what "policies and procedures" the entity will put in place to "ensure compliance with . . . all applicable laws, . . . including immigration laws, criminal laws, and securities laws." *Id.* § 1153(b)(5)(E)(iii)(II). The proposal must also attest that every person "involved with the regional center," *id.* § 1153(b)(5)(E)(iii)(III), will be a U.S.

national or lawful permanent resident, *id.* § 1153(b)(5)(H)(ii)(I)(aa), expressly excluding felons, *id.* § 1153(b)(5)(H)(i)(I)(cc).

The RIA also establishes an "EB-5 Integrity Fund" to cover expenses for the monitoring and investigation of fraud. § 103(b)(1)(J), 136 Stat. at 1090 (codified at 8 U.S.C. § 1153(b)(5)(J)). Clause (J)(ii), the fee provision, directs the Secretary of Homeland Security (Secretary) to "collect for the Fund an annual fee" from "each regional center designated under subparagraph (E)." 8 U.S.C. § 1153(b)(5)(J)(ii)(I). The size of the fee depends on the number of individuals investing in the center. Regional centers "with 20 or fewer total investors" contribute $10,000. *Id.* §1153(b)(5)(J)(ii)(I)(bb). Centers with more investors must pay twice that amount. *Id.* § 1153(b)(5)(J)(ii)(I)(aa). The fee provision also requires the Secretary to "impose a reasonable penalty" on "any regional center" that does not pay the fee within 30 days after the annual statutory deadline and to "terminate the designation of any regional center" that is more than 90 days late in paying the fee. *Id.* § 1153(b)(5)(J)(iv).

After the RIA became law, the legal status of regional centers designated pre-RIA was unclear. For a time, the USCIS—acting for the Secretary—continued to treat these centers as authorized to participate in the new program. *See Behring Reg'l Ctr.*, 2022 WL 2290594, at *2. But the agency soon changed course, declaring in a public notice that, because the RIA had expressly "repealed" the rider provision establishing the pilot program, all "regional centers previously designated" before the RIA's passage were "no longer authorized" and needed to seek re-designation. J.A. 69.

The USCIS never carried out its plan to treat pre-RIA regional centers as de-authorized because a district court

enjoined the agency from doing so. *Behring Reg'l Ctr.*, 2022 WL 2290594, at *7. The *Behring* court, however, was careful to qualify that its decision would not hamstring the USCIS from "do[ing] whatever [was] reasonably necessary to ensure that the existing regional centers comply" with the RIA. *Id.* Following the *Behring* decision, the USCIS "agreed to rescind its categorical deauthorization of pre-Act regional centers," provided that any such center "wish[ing] to continue sponsoring new investment projects and new investors had to submit a new application for a regional-center designation." *Sunshine State Reg'l Ctr. Inc. v. Dir., U.S. Citizenship & Immigr. Servs.*, 143 F.4th 1331, 1336 (11th Cir. 2025).

After *Behring*, the USCIS published a notice announcing the Secretary's plan to enforce the RIA's fee provision for the 2023 fiscal year. Notice of EB-5 Regional Center Integrity Fund Fee, 88 Fed. Reg. 13,141, 13,142 (Mar. 2, 2023). The notice gave all regional centers until April 1, 2023, to pay the fee. *Id.* For those centers that didn't pay within 90 days, the USCIS planned to "terminate the[ir] designation[s]." *Id.* at 13,143.

Appellant EB5 Holdings (EB5) owns two regional centers that were designated by the Secretary before the RIA became law. Shortly after the USCIS published the March 2023 Integrity Fund fee-collection notice, EB5 sued the agency in district court under the Administrative Procedure Act (APA). 5 U.S.C. § 551 *et seq.* EB5's sole contention was that the fee provision did not authorize the Secretary to collect the annual Integrity Fund fee from regional centers that received their designations before the RIA was enacted. Thus, EB5 maintained, to the extent the USCIS's notice sought to collect the fee from these so-called "legacy centers," it exceeded the Secretary's statutory authority under the RIA, was contrary to law and was arbitrary and capricious under the APA. J.A. 15.

EB5 moved for summary judgment and the USCIS cross-moved for dismissal under Federal Rule of Civil Procedure 12(b)(6). The district court denied EB5's summary judgment motion and granted the USCIS's motion to dismiss. The court concluded that the fee provision's requirement that "each regional center designated under subparagraph (E)" must pay the annual Integrity Fund fee "unambiguously" applied to "both pre- and post-RIA regional centers." J.A. 127. This appeal followed.

## II. ANALYSIS

We have jurisdiction under 28 U.S.C. § 1291 and our review of the district court's summary judgment denial and its dismissal under Rule 12(b)(6) is de novo. *Pub. Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342, 1345 (D.C. Cir. 2007). The fee provision of the RIA requires the Secretary to collect the annual Integrity Fund fee from "each regional center designated under subparagraph (E)." 8 U.S.C. § 1153(b)(5)(J)(ii)(I)(aa). The sole question in this appeal is whether pre-RIA regional centers—those entities that became regional centers before the enactment of the RIA—constitute "regional center[s] designated under subparagraph (E)." *Id.* If they do, then all parties agree that they must pay the annual fee.

EB5 contends that "designat[ion]" in the fee provision refers to the discrete act of designation performed by the Secretary at a singular point in time. Thus, according to EB5, pre-RIA regional centers are exempt from the fee provision because they were not "designated under subparagraph (E)." They were designated under the 1992 rider provision—that is, before subparagraph (E) became law. The USCIS replies that the fee provision does not turn on the timing of a regional center's designation at all but instead on whether the entity is *currently* "designated" to operate as a regional center. Thus,

because all pre- and post-RIA regional centers are, at present, "designated" to participate in the regional center program, they all must pay the fee. We conclude the Secretary has the better reading of the fee provision. In so holding, we align ourselves with the Eleventh Circuit—the sole circuit to have addressed the question until now. *Sunshine State*, 143 F.4th 1331.

"[W]e start where we always do: with the text of the statute." *Van Buren v. United States*, 593 U.S. 374, 381 (2021). And we can end there as well because the statutory language is clear: By using the past participle "designated" to describe the regional centers subject to the fee, the fee provision's focus is on the entity's current status as a designated regional center, not on the discrete event of the center's designation—and plainly not on the timing of that designation. In ordinary English grammar, we "routinely" use the past participle in this sense—that is, as an adjective "to describe the present state of a thing." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 84 (2017). Thus, for example, an "escaped" prisoner is currently at large, a "broken" window is not yet fixed and a "delayed" train has not yet arrived. When used "as [an] adjective[] to describe the present state of [a] noun[]," *id.*, the past participle "gives no indication of the relative timing of events," *Bernal v. NRA Grp., LLC*, 930 F.3d 891, 895 (7th Cir. 2019) (citation modified).

We have applied this straightforward rule of grammar many times, and to the same effect, in construing statutes. In *Gentiva Health Services, Inc. v. Becerra*, 31 F.4th 766 (D.C. Cir. 2022), the question before us was whether hospice-care reimbursements "made under" Part A of the Medicare Act, 42 U.S.C. § 1395f(i)(2)(A), were limited to payments already disbursed within a fiscal year. Payments "made," we concluded, "simply describes the present state of the 'amount of payment' in question," not "a discrete historical amount"

paid at a specific point in time.  *Gentiva Health Servs., Inc.*, 31 F.4th at 776 (citation modified).  In *Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024), the issue was whether the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901–08, imposed a "temporal requirement" for designating someone as a Tier 2 drug trafficker based on his material assistance to a "foreign person[] designated by the Secretary of Treasury" as a Tier 1 trafficker, *Bello*, 94 F.4th at 1072 (discussing 21 U.S.C. § 1904(b)(2)–(3)); *id.* ("Bello argues that the statute's past participle 'designated' . . . necessarily means *already* designated, that is, before [a] Tier 2 designation.").  We agreed with the Secretary that the past participle "designated" did not specify the timing of a predicate Tier 1 designation.  *Id.*  The designation could occur either in the "past [or] simultaneous[ly]" with a Tier 2 designation.  *Id.*  And in *Henson*, the Supreme Court confronted whether, under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, collecting a debt "owed . . . another" included buying a debt from a third party and then collecting it for itself.  *Henson*, 582 U.S. at 81 (discussing 15 U.S.C. § 1692a(6)).  It did not, the Court reasoned, because a debt "owed . . . another" is a debt currently, not previously, owed a third party.  *Id.* at 84.  We believe the same holds true for entities "designated" as regional centers in the fee provision.  "Designated" regional centers are simply those entities currently authorized to take part in the regional center program.  The timing of the center's designation is irrelevant.

Granted, the past participle is an "uncommonly flexible device."  *Bernal*, 930 F.3d at 895.  When paired with other "closely associated . . . words, such as modifiers or complements," The Chicago Manual of Style § 5.115 (18th ed. 2024), it can describe something that happened in the past, *see* Michael Swan, *Practical English Usage* § 493.2.b (1980) (linking "time-adverbs" with the past participle can indicate "a

past event"); *e.g.*, *Bernal*, 930 F.3d at 895 ("[T]hose arrested *yesterday*.") (emphasis added). EB5 insists the fee provision works in this way by qualifying that regional centers subject to the fee are designated "under subparagraph (E)." To put a grammarian's gloss on EB5's argument, "designated" is a past-tense verb, not an adjective, and the prepositional phrase "under subparagraph (E)" is an adverbial phrase—combine the two and "designated under subparagraph (E)" describes not the entity's ongoing status as designated regional center but the moment the Secretary designated the entity as one. Regional centers are thus subject to the fee, EB5 submits, only if the Secretary "designated [them] under subparagraph (E)," which cannot include pre-RIA centers because the Secretary had designated them "before enactment of 'subparagraph (E).'" Appellants' Opening Br. 15.

The problem with EB5's argument is that it ignores how the past participle is used as a verb. To indicate an action or event, we ordinarily pair the past participle with an auxiliary verb: "*was* designated," "*is* designated," "*will be* designated." *See* Swan, *supra*, § 451.2. Or the past participle could be followed with "by" to "introduce the agent (the person or thing that does the action)." *Id.* § 453.5. Recall how the Congress described regional center designation in subparagraph (E)'s "In general" clause: Under that provision a regional center is an entity "in the United States, which *has been* designated *by the Secretary of Homeland Security* on the basis of a proposal for the promotion of economic growth." 8 U.S.C. § 1153(b)(5)(E)(i) (emphasis added). "Has been" works with "designated" to denote a "past action[] . . . which [is] completely finished" yet has "some present importance," Swan, *supra*, § 493.2.b, and "by the Secretary" describes the action-taker—all textual breadcrumbs suggesting that "designated" in this phrase acts as a verb to describe the discrete act of designation by the Secretary. How the Congress

conveys meaning in one part of a statute is typically a strong indicator of how it meant to convey the same meaning in another. So we expect the Congress would have used phrasing similar to clause (E)(i) had it intended "designated" to focus on the act of designation by the Secretary. The provision might have read something like this: "regional centers [that have been] designated [by the Secretary] under subparagraph (E)." *Id.* § 1153(b)(5)(J)(ii)(I)(aa).

We nonetheless agree with EB5 that the "under subparagraph (E)" language does some work in the fee provision. It complements the past-participle adjective "designated" by denoting the statutory source of every regional center's designated status. A prepositional phrase beginning with "under" is often used to identify the legal basis of the subject or object of the sentence. The Framers were fond of the phrase; the original articles of the Constitution refer to subjects as arising or existing "under the Authority of the United States," U.S. Const. art. I, § 6, cl. 2; *id.* art. VI, cl. 2, "under this Constitution," *id.* art. III, § 2, cl. 1; *id.* art. VI, cl. 1, or "under the United States," *id.* art. I, § 3, cl. 7 & § 6, cl. 2; *id.* art. II, § 1, cl. 2; *id.* art. VI, cl. 3. When used in this sense, "under" simply "means 'subject or pursuant to' or 'by reason of the authority of.'" *St. Louis Fuel & Supply Co. v. FERC*, 890 F.2d 446, 450 (D.C. Cir. 1989) (citation modified); *accord Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 124 (2018). Here, it was entirely natural for the Congress to describe all regional centers as "designated under subparagraph (E)" because subparagraph (E) is the statutory source of the "[r]egional center program." 8 U.S.C. § 1153(b)(5)(E) (boldface deleted). Thus, to be a "designated [regional center] under subparagraph (E)" means the regional center's legal status flows from subparagraph (E), which is true for all currently active regional centers. *See Sunshine State*, 143 F.4th at 1340 ("To be 'designated under subparagraph (E)' is to be

designated to participate in the regional-center program under subparagraph (E)." (emphasis omitted)).

In EB5's view, "designated under subparagraph (E)" does more. EB5 argues that the phrase refers to the post-RIA regional centers the Secretary has designated (or will designate) pursuant to clause (E)(iii)—because that is the only part of subparagraph (E) that "lays out the criteria a corporate entity must satisfy to be designated as a 'regional center.'" Appellants' Opening Br. 16 (quoting 8 U.S.C. § 1153(b)(5)(E)(iii)). But here again, EB5's reading of the fee provision is not the most natural one. If the Congress wanted to cross-reference clause (E)(iii) in the fee provision, it would have done so. Instead, it referred generally to regional centers as designated under "subparagraph (E)," literally the statutory placeholder for the "[r]egional center program" as a whole. *Id.* § 1153(b)(5)(E); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 221 (2012) (title-and-headings canon) ("The title and headings are permissible indicators of meaning."). There is no dispute that pre-RIA regional centers are currently "designated" to operate "under" the program. Indeed, EB5 has no choice but to concede the point. If pre-RIA centers are not designated to participate in the regional center program under subparagraph (E), they are not bona fide regional centers because the "only regional-center program" sanctioned to exist "is the one under subparagraph (E)." *Sunshine State*, 143 F.4th at 1340.

Trying at it from a different angle, EB5 argues that if the Congress intended the fee provision to apply to all currently designated regional centers, it would have chosen an easier formulation than "regional center[s] designated under subparagraph (E)." "[A]ny regional center" would have made more sense, according to EB5, because that is the phrase the Congress went with elsewhere in the RIA. *See, e.g.*, 8 U.S.C.

§ 1153(b)(5)(G)(iii)(I) (USCIS "shall sanction any regional center" for failing to submit an annual statement); *id.* § 1153(b)(5)(H)(iv)(I) (Secretary may suspend or terminate "any regional center" for knowingly involving prohibited persons in a commercial enterprise). EB5 thus relies on the "presumption of consistent usage and the meaningful-variation canon," the interpretive principle that a change in statutory language presumably indicates a change in meaning. *Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (quotation omitted). The Congress knew to use the broadest language possible when referring to all regional centers, the argument goes, but did not do so in the fee provision, which necessarily means the provision covers a narrower subset of regional centers.

This argument fares no better. Because it creates only a rebuttable presumption, the meaningful-variation canon is "particularly defeasible by context." Scalia & Garner, *supra*, at 171; *see, e.g.*, *Pulsifer*, 601 U.S. at 151 (canon carries less force if the disparately worded provisions were enacted decades apart). And here, the RIA's surrounding provisions confirm that the Congress did not mean for "any regional center" and "regional center[s] designated under subparagraph (E)" to carry different meanings because the Congress used the two phrases interchangeably in the RIA. Subparagraph (G), for instance, provides that "[e]ach regional center designated under subparagraph (E)" must submit an annual statement certifying the center's compliance with certain requirements of the Act, 8 U.S.C. § 1153(b)(5)(G)(i), and authorizes the USCIS to "sanction *any* regional center . . . if [it] fails to submit an annual statement." *Id.* § 1153(b)(5)(G)(iii)(I) (emphasis added). But there is an even better example: Subparagraph (J) of the RIA equates "regional center[s] designated under subparagraph (E)" with "any regional center" when describing the fee requirement at the center of this case. After directing the Secretary to "collect" the fee from each regional center

"designated under subparagraph (E)," *id.* § 1153(b)(5)(J)(ii)(I), subparagraph (J) requires the Secretary to fine or terminate "any regional center" for failing to pay the fee, depending on the length of non-payment, *id.* § 1153(b)(5)(J)(iv). "There can be few better illustrations of the 'defeasib[ility]' of the meaningful-variation canon," *Pulsifer*, 601 U.S. at 151 (quoting Scalia & Garner, *supra*, at 171), than the Congress's change of statutory phraseology to express the same idea. It may suggest a stylistic drafting choice. And if so, "the presumption that a change in language indicates a change in meaning does not apply." *United States v. Hillie*, 38 F.4th 235, 239 (D.C. Cir. 2022) (per curiam) (Katsas, J., concurring in denial of rehearing en banc) (quotation omitted).

More importantly, subparagraph (J)'s alternating use of "any regional center" and "each regional center designated under subparagraph (E)" deals the final blow to EB5's case. If "any regional center" means what EB5 says it means (all regional centers, including pre-RIA centers), and if subparagraph (J) allows the Secretary to fine or de-designate "any" center for not paying the fee, 8 U.S.C. § 1153(b)(5)(J)(iv), the Secretary can plainly "collect" the fee from any center in the first place, *id.* § 1153(b)(5)(J)(ii)(I). Or to put it the other way around, EB5 cannot be correct that subparagraph (J)'s references to "any regional center" and "each regional center designated under subparagraph (E)" are talking about different centers—all regional centers versus only new ones. That would mean the Secretary could penalize every regional center for not paying a fee that subparagraph (J) requires only a subset of regional centers to pay.

EB5's final parry is that reading the fee provision to apply to pre-RIA regional centers violates the presumption against retroactivity. Under that interpretive principle, we presume that the Congress legislates only for the future. Scalia &

Garner, *supra*, at 261. Thus, "absent clear congressional intent favoring such a result," we avoid a particular reading of a statute if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). EB5 claims that applying the fee provision to pre-RIA centers would retroactively impose a "new dut[y]" on those centers "based on a [regional-center] designation from years before the [fee provision] was enacted." Appellants' Opening Br. 27.

EB5's argument fails because there is no retroactivity problem with our reading of the fee provision. Our sole conclusion is this: Pre- and post-RIA regional centers alike are subject to the fee provision because they are all currently "designated" to participate in the regional center program authorized under subparagraph (E). Nothing about our holding burdens pre-RIA centers more than their post-RIA counterparts "based on" pre-RIA actions. Appellants' Opening Br. 27. Under our interpretation, a regional center designated 20 years ago must pay the same fee as a regional center designated yesterday—$10,000 or $20,000, depending on the number of investors. 8 U.S.C. § 1153(b)(5)(J)(ii)(I)(aa)–(bb). EB5's observation that "there was no annual fee when [the] USCIS designated" pre-RIA centers changes nothing. Appellants' Opening Br. 27–28. A burden is not retroactive simply because it is "new." *See Landgraf*, 511 U.S. at 269–70, 269 n.24. It must relate to some "past conduct . . . or transaction[]" or "impair rights" already "possessed." *Id.* at 280. Our holding, by contrast, is purely forward-looking: If pre-RIA centers wish to *retain* their designated status, they must pay the fee. *Sunshine State*, 143 F.4th at 1346–47 ("A prospective fee for continued participation in the regional-center program is not a new duty with respect to a transaction already completed.").

17

* * *

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*